Argued at Pendleton October 31; reversed December 5, 1939;
rehearing denied January 23, 1940

## STUBBLEFIELD ET AL. *v.* MONTGOMERY WARD & CO. ET AL.

(96 P. (2d) 774, 98 P. (2d) 14)

In Banc.

434

*Charles Z. Randall* and *William Perry*, both of Pendleton, for appellants.

*John Kilkenny*, of Pendleton (Raley, Kilkenny & Raley, of Pendleton, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the defendants, W. M. Mitchell and Montgomery Ward & Company, a corporation, from a judgment of the circuit court in the sum of $1,942.60, based upon the verdict of a jury. The respondents, who were the plaintiffs, are husband and wife. Their cause of action was predicated upon charges that the defendants, after having contracted by written agreement to do some plumbing work for the plaintiffs, breached their contract through unwarranted delay and unskillful workmanship. The verdict and judgment are thus constituted:

Damages incurred through injury to plaintiffs' building ................................................$ 300.00
Damages as the reasonable rental value of the building during delay ........................................ 3,000.00

$3,300.00

Value of the material and labor furnished by the defendants ................................................ 1,357.40

Amount of the verdict and judgment ..................$1,942.60

The appellants (defendants) present no contentions concerning the item of $300 damages to the building. They do not, however, admit that they damaged the

building. The plaintiffs admit that they paid nothing to the defendants for their work and material. We are, therefore, concerned only with the damages allowed as the reasonable rental value of the building during the delay. Concerning it the defendants present the following assignments of error: The court erred (1) in employing rental value, and not interest upon invested capital, as the measure of damages to compensate for the period of delay; (2) in receiving opinion testimony concerning the rental value of the structure as the latter would have been if completed (at the time the defendants committed their alleged breech the building was only partially built and has not been completed since); (3) in not withdrawing from the jury's consideration the rental value testimony just mentioned; and (4) in receiving as evidence a letter of complaint from the plaintiffs to the defendants following the state plumbing inspector's rejection of the work which the defendants had done.

In the Blue mountains, at an elevation of 4,200 feet, is a place named Lehman Springs owned by the plaintiffs. It is about fifty miles south of Pendleton and about forty miles west and slightly south of La Grande. The waters of the springs, according to one of the witnesses, possess curative properties, and in the timbered areas surrounding the springs are deer and elk. These facts make the place an attractive resort. In 1925 when the plaintiffs purchased this property it was improved with a 24-room hotel, which the plaintiff Fancho Stubblefield described thus: "It was a part old log hotel and a part annex built on to it out of rough boards." There were no plumbing fixtures of any kind in its rooms. Two years later the building was destroyed by fire.

In 1933 the plaintiffs started construction of a new hotel which was to consist of 24 guest rooms, lobby, kitchen, barroom, storeroom, and four servant rooms. The plans provided that the main structure should be 40 by 70 feet in dimension. In addition to its two principal floors there were to be a basement and a third partially finished floor in the attic. Forming a part of the building there was to be a kitchen annex 24 by 28 feet in size with the aforementioned servant rooms overhead.

The construction of the hotel made very slow progress, due to the lack of funds. As stated above, construction was begun in 1933. By the latter part of 1937 the exterior of the building had been constructed and the roof had been shingled. However, at that time construction of the front porch had not been completed and some of the scaffolding was still in place. Very little progress had been made with the interior. The rough or sub-floor had been laid and the electric wires had been strung, but the framework for the bathrooms had not been set.

In the latter part of 1937 the plaintiffs became interested in that part of the installation of the plumbing known as the "roughing in"; that is, the installation of the various vent, water and waste pipes which serve the plumbing fixtures later to be placed. The plaintiffs desired that each guest room should have a bathroom containing a bathtub, toilet and washbowl. Their inquiries disclosed that the cost of material and labor for the roughing in would approximate $1,000. It seems that at that time the property was encumbered with a laborer's or materialman's lien. This circumstance afforded the basis for obtaining the funds with which to pay for the plumbing. One of the plaintiffs'

witnesses testified: "Well, the plumbing was to be paid for out of funds that were at first in the hands of Judge Maloney of Portland, that was left over from the payment of bills and a prior lien upon the hotel. The loan, as I recall it, was $7,000, and these bills and the prior lien amounted to something like $5,500, leaving $1,500 on hand." In this manner $1,500 was rendered available to take care of the cost of installing the plumbing.

Defendant Mitchell was at that time a licensed plumber following his trade in Pendleton. The defendant Montgomery Ward & Company operated a store in that city and sold, among other items, plumbing supplies and fixtures. The manager of its Pendleton store was Stanley Day. January 5, 1938, the parties to this action signed the contract with which we are now concerned. It bound the defendants to supply the necessary materials and labor for the aforementioned roughing-in work. It provided that the work should be done "in a good, careful and skillful manner * * * in accordance with the laws of the State of Oregon and the rules and regulations pertaining to this character of work." It bound the plaintiffs to pay $773 for the materials and $165 for the labor.

The contract mentioned no time limit for either the beginning or the completion of the work. The parties seem agreed that a reasonable time was the time limitation. Mr. Stubblefield swore that before he signed the contract he several times told both Day and Mitchell that their work would have to be done in the winter months so that he could complete the rest of the construction in the same season and have the building ready for occupancy in the spring of 1938. He also swore that before the contract was signed he told them

that he had not only secured the money with which to pay for the plumbing, but had also (a) contracted for the lumber necessary to complete the work after the plumbers had finished the roughing in; (b) contracted for the labor required to complete the interior; and (c) secured a promise of a loan from one A. H. McIntyre of sufficient money to enable him to defray all remaining expenses incidental to the completion of the building as a hotel. Both Day and Mitchell deny that this information had been given to them.

The plaintiffs did not intend to plaster the interior walls, but to sheet them with knotty pine lumber. Mr. Stubblefield and two individuals named Wickstrom and Womack, who operated a small sawmill, signed a contract December 11, 1937, in which Stubblefield promised to purchase, and Wickstrom and Womack promised to sell to him, 350,000 feet of lumber in the spring of 1938. Stubblefield claims that the contract price was less than the market price, and contends that this lumber would have enabled him to sheet, or, as he called it, seal, the inside walls of the structure and cover the sub-floors with the finish floor. He also claims that Wickstrom and Womack had agreed to supply a crew of men to finish the interior with the aforementioned knotty pine lumber and lay the flooring. He swore that he told Day and Mitchell about that agreement. A. H. McIntyre, previously mentioned, was asked, "Now, Mr. McIntyre, first of all, state whether or not in the fall of the year 1937, or in the month of December, 1937, you agreed to make Mr. Stubblefield a loan with which to complete his building." After an objection had been made and overruled, the witness inquired, "What was the question again?" whereupon plaintiffs' counsel asked, "Did you

make such an agreement with Mr. Stubblefield?" He answered, "Yes, sir, that is right." Next he was asked, "What was the amount of the loan?" and answered, "It was between seventy-five hundred dollars and ten thousand dollars, as I remember it." The above is substantially all of the testimony in regard to McIntyre's alleged promise of a loan. Since no writing was produced, we assume that McIntyre's promise was an oral one. Based upon the foregoing, the plaintiffs claim that they were assured of the necessary money, labor and material for the completion of the structure, and that they could have completed it and had it ready for occupancy thirty days after termination of the defendant's work. They argue that in determining what constitutes a reasonable time, the circumstances above mentioned must be considered.

Mitchell did not begin his work until March 17, 1938. May 8 he believed that he had completed it and on that day the job was inspected by a state plumbing inspector who, however, condemned it almost in its entirety. May 9 Stubblefield prepared and signed a letter addressed to the defendants (mentioned in the defendants' fourth assignment of error) in which he complained of the treatment which he had received from them, mentioned the plumbing inspector's rejection of the work, stated that he had been delayed in his plans for opening the hotel and, indirectly at least, expressed the hope that the situation would be remedied by the defendants. May 10 Stubblefield, Day, Mitchell, the plumbing inspector, and an attorney who represented the plaintiffs and Maloney, held a meeting in Pendleton. Stubblefield swore that in the course of this meeting the defendants promised to do their work properly and to complete the job May 28. The defendants admit that in the

course of the meeting they promised to complete the work in a workmanlike manner, but deny that they promised completion May 28. Stubblefield swore that had the work been completed on May 28 he could have finished the interior before July 1 and have opened his hotel on that day. According to Stubblefield, Mitchell informed him in the early part of June that all defects had been remedied and that the job was ready for inspection. The aforementioned inspector returned to Lehman Springs June 7, but again rejected the work. After the second rejection Mitchell did not return to the place, and two other plumbers sent by Day completed the work. August 18 the inspector issued a certificate of approval.

The plaintiffs contend that the above evidence warrants a conclusion that May 28 marked the termination of a reasonable time for the completion of the work, and that it also shows they could have had the hotel ready for occupancy by July 1 had the defendants completed the execution of their contract May 28. They argue that they are entitled to damages based upon the rental value for the period of July 1 to December 1, 1938. The yardstick which should be employed in the measurement of those damages is the problem before us.

The roughing in work had been completed before August 18 and on that day had been approved by the state plumbing inspector. However, after that day the plaintiffs did no more work upon the building and, so far as is disclosed by the record, the structure stands today in the same condition as then. Before August 18 Wickstrom and Womack had become insolvent, and the lumber which was at their mill had become encumbered with laborers' liens. Prior to their insolvency

the plaintiffs had not directed them to cut any lumber for this job, and no lumber whatever was delivered to Stubblefield under the agreement between him and those men. Likewise no work had been performed under the labor contract aforementioned. Stubblefield admitted that the price to be paid to Wickstrom and Womack for the lumber and the labor had become a subject of dispute before August 18. The plaintiff testified that when the defendants failed to complete their contract within the time he had contemplated "it affected the whole set-up; and McIntyre didn't furnish any money to complete the place." In another part of his testimony he said: "I haven't made any efforts to seal the building because my financial set-up was knocked in the head  *  *  *  and the lumber was tied up at that time  *  *  *." To another question which inquired "Have you laid one board of finished material or flooring in there since the plumbers have been entirely out of there?" he answered, "No. I was advised by my attorneys not to as the jury might want to look at the plumbing." In other words, the building has not been completed.

We come now to the testimony concerning the rental value of the structure. The plaintiffs presented no evidence showing that the incomplete structure possessed any rental value; in fact, the plaintiff admitted, "I don't know if I could rent an unfinished building or not." By "incomplete structure" we mean the building as it stood May 28 or thereabouts. Apparently on August 18 the bathroom partitions had not yet been set. Photographs, which were taken for the purposes of the trial, show that even at that time the front porch was incomplete and the exterior of the building had

not been painted or treated in any other manner and was encumbered with some scaffolding.

We shall now review the evidence which the plaintiffs presented concerning rental value. Stubblefield was asked "What would you say would be the reasonable rental value of that hotel building if the same had been completed on the 1st day of July, 1938; that is, the reasonable rental value per month during the remainder of the summer and fall season?" He answered, "$1250.00 per month." R. T. Ragsdale, who at the time of the trial was the manager of the Moffett Hot Spring Company, was asked for his opinion of the reasonable rental value of the hotel in question "if the hotel had been sealed, that is, completed for occupancy and the hot and cold water and bathrooms and toilets had been installed, and the hotel opened for business." He answered, "A man could afford to pay one thousand dollars per month for it." He added, however, that in the operation of such a place much of its earning power would depend upon the management, the dining room, the service, and the ability of the physician in attendance. J. H. Estes, a real estate broker located in Pendleton, who admitted that he had never rented a resort of the type with which we are concerned, was asked for his opinion of "the reasonable rental value of that hotel building for the season from the first day of July, 1938, if the hotel building had been completed, properly sealed with ceiling and floors properly finished all through, with hot and cold water in each of the rooms and baths and toilets in each of the rooms; in other words, that it was ready to open for business." He answered, "Twelve hundred dollars per month." He admitted that he possesed no knowledge concerning the manner in which it was

proposed to finish and furnish this hotel, and said, "I am giving my opinion upon the theory that it is going to be finished, furnished and equipped." He believed that its earning capacity would depend partially upon its management, the class of service it rendered and the excellence of the meals served in the dining room. Mary M. Davis, who operates a hotel at Ritter Hot Springs, was the only other witness who testified concerning the rental value of the structure in question. Her place appears to be about fifty miles from Lehman Springs. Mrs. Davis was asked for her opinion "as to the reasonable rental value of that hotel building during the season of 1938, after the 1st of July of that year, if the hotel building had been sealed and completed and finished on the inside, and had the rooms furnished and the remainder of the hotel furnished and the hot and cold water to the rooms and the bathtubs and toilets in the rooms, * * *?" She replied, "It would be around between eleven and twelve hundred dollars." She also thought that much would depend upon the furnishings, equipment, management, dining room, and, to some extent, upon the attendant physician.

As indicated in the first paragraph of this decision, the jury awarded to the plaintiff $3,000 damages for unnecessary delay, which award the jury evidently believed represented the rental value of the structure in the period July 1 to December 1, or some part of that period. No one testified that the plaintiffs were able to complete the construction of the building. McIntyre, as we have seen, was asked whether in the latter part of 1937 he "agreed to make Mr. Stubblefield a loan with which to complete this building," and answered, "Yes, sir, that is right." He was then asked, "What was

the amount?'' and replied, ''It was between seventy-five hundred dollars and ten thousand dollars, as I remember it.'' However, the plaintiffs presented no testimony showing that $7,500 or $10,000 would have completed construction. The plaintiff, apart from saying that he intended to cover the interior walls with knotty pine lumber, did not mention what else he expected to do. No word was said concerning the method of heating the hotel or the cost thereof. Electric light fixtures would have to be supplied, but their character and cost were not mentioned. We assume that the inside walls when constructed of the aforementioned lumber would have to be shellacked, varnished or painted, but what the plaintiffs intended to do in regard thereto they did not say. In fact, the plaintiffs seemed to be uncertain whether they would use the knotty pine in its green condition or have it dried before nailing it to the studding. Their uncertainty, possibly, accounts for the following instruction which was given to the jury: ''If you find from the evidence that before the finishing lumber could be installed it was necessary that the same be dried and planed, and if you further find from the evidence that neither Wickstrom nor the plaintiffs had available for installation at the time the plumbing contract was completed any finishing lumber or flooring * * * if on the other hand, the plaintiffs were willing to use green lumber without drying, then the element of the time within which it takes to dry lumber would not be present.'' In other words, the plaintiffs had not decided whether they would finish the interior with green or dry lumber. That being true, surely the three witnesses who, in addition to Stubblefield, testified concerning rental value could not have known. We observe that one of the wit-

nesses testified that green knotty pine lumber shrinks so badly "you could almost crawl through the walls." Others, whose testimony likewise is not questioned, swore that such material, if used green, warps, checks and cups. Obviously, the interior construction of a hotel has a material bearing upon its rental value. As already indicated, three of the witnesses included furnishings when they expressed opinions concerning rental value, and admitted that furnishings materially influenced the earning power of a hotel. More than one of them mentioned equipment. Neither of the plaintiffs indicated in any manner whatever what furnishings and equipment were to be installed in the building. Likewise no one testified that the contemplated McIntyre loan would have enabled the plaintiffs, not only to complete construction but also to purchase the furnishings and the various items of equipment (cook- and refrigerating) for the kitchen. Obviously, a hotel completely furnished has a much greater rental value than an unfurnished one. In dwelling at this length upon the testimony concerning furnishings we have no thought that that testimony had any place in this proceeding, or that the measure of damages was concerned with the building properly furnished. The opposite is our belief. However, the testimony concerning furnishings was produced in the manner which we have indicated, and hence we were compelled to mention it. We are satisfied that it was not in the contemplation of the parties, when they signed the plumbing contract, that its breach would require the defendants to pay the rental value of the building as a going hotel completely furnished.

In endeavoring to ascertain whether McIntyre's loan of $7,500 to $10,000, if made, would have enabled

the plaintiffs to complete construction of the hotel, we have taken note of the following items which would have had to be paid for. Stubblefield testified that 50,000 feet of knotty pine lumber were necessary to sheet the inside walls; that 15,000 feet of flooring were necessary; and that, for some purpose which he did not mention, 5,000 feet of clear lumber would have to be purchased. Presumably, the clear lumber would be necessary for door casings, baseboards, etc. He swore that he and Wickstrom had agreed upon $17.50 per thousand feet as the price to be paid for the knotty pine, and that he thought that $12 per thousand feet was the agreed labor cost of applying this material to the studdings; but he admitted that Wickstrom's version of the labor contract called for a larger sum. Mr. L. Livermore, as a witness for the plaintiffs, testified that the market price of knotty pine was $55 per thousand feet. The plaintiff did not mention the price of clear lumber and of flooring, but Livermore testified that the price of flooring was $65 per thousand at Pendleton with an additional charge of $5 per thousand for delivery at Lehman Springs. We assume that clear lumber for finish purposes would possibly cost the same. Accordingly, using minimum figures, $29.50 per thousand would represent the price of the knotty pine when nailed to the wall. Fifty thousand feet would, therefore, cost $1,475; 20,000 feet of flooring and clear lumber at $65 per thousand would be $1,300, allowing nothing for carpenters' wages. But if we assume the latter to be $12 per thousand, the labor charge for the flooring and the clear lumber would be $240. The total of these items is $3,015. In the plumbing contract Montgomery Ward & Company agreed to sell to the plaintiffs within a stipulated period of time bathtubs

at $49.90 each, lavatories at $21.85 each and toilets at $18.10 each. The defendants agreed to install the tubs at a labor cost of $1.50 each, the lavatories at $2 each and the toilets at $1 each. Therefore, the plumbing in the 24 bathrooms, apart from the roughing in, would have cost $2,264.40. Accordingly, the cost of the 24 bathrooms added to the cost of the inside lumber and its attendant carpenter work would be $5,279.40. This, of course, includes nothing for the plumbing work in the kitchen, public rooms and the four servant rooms; nor does it allow anything for inside painting and varnishing, light fixtures or heating equipment. None of the witnesses mentioned doors and hardware, and yet we assume that they would have been required. Likewise, refrigeration and kitchen equipment were necessary, or otherwise virtually all of the rental value testimony was inadmissible.

■■ The measure to be employed in determining the amount of the consequential damages in this case is well established, we believe. From Restatement of the Law, Contracts, § 331, we quote:

"Damages are recoverable for losses caused or for profits and other gains prevented by the breach' only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty."

The plaintiffs do not ask that the consequential damages be measured by the anticipated profits of the hotel, and hence we shall pass on to the next paragraph of § 331 which states the measure to be employed where the profit yardstick is not available; but before passing on we pause to observe again that the evidence must afford "a sufficient basis for estimat-

ing'' the amount of the damages. The second paragraph of § 331 follows:

''Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property.''

The Restatement accompanies the statement of the second of the above principles with the following comment:

''The A bridge construction company contracts with the B railroad for the construction of a bridge by an agreed date. By reason of A's delay B is prevented from operating part of its road. If the amount of profits that would have been made by such operation is too uncertain, the court may allow interest on the cost of construction of that portion of its line that B has been prevented from operating.''

Volume 17, C. J., Damages, p. 854, § 171, states:

''Where by reason of defendant's delay in performing his contract, plaintiff's property has been compelled to remain idle, interest upon the value of the property may afford a proper measure of damages. Ordinarily, however, rental value or value of the use of the property will be resorted to * * *.''

■ The parties in their briefs review many decisions, but we think those decisions do nothing more than illustrate the application of the rules above stated. In each of them the court was endeavoring to perform the cardinal purpose of the law of damages—to place the wronged party in as good a position as he would have been in had the other performed his contract.

Section 703, Sutherland on Damages (4th Ed.), is much cited in the decisions. The pertinent part follows:

"Where a person undertakes to erect a building or to put a mill or machinery in operation or to furnish material for a building he ought to be holden to indemnify the other party against the loss of the use of either after the expiration of the time for performing the contract; and if it is defectively done he should indemnify him for such loss of the use during the time necessarily spent in repairing and putting it in order. In such cases and in others where a particular result is stipulated for, the rental value during the delay is the general rule."

■ The following taken from 9 C. J., Building and Construction Contracts, p. 793, § 135, states substantially the same rule:

"In the absence of such stipulations the owner is generally entitled to the value of the use of the building or structure for the time he was deprived thereof by the builder's delay, the amount of which is usually estimated as the fair rental value during such time, unless it clearly appears that the owner could not during the delay have rented the building."

These three quotations merely express in amplified language the principles stated in the Restatement.

An examination of the cases cited in the above sections of Sutherland on Damages and Volume 9 of Corpus Juris discloses that in all of them the breach by the contractor was the only factor that prevented the building or the machinery involved from producing the desired results. Therefore, the court charged him with the gains which his default prevented the owner from receiving; or with the rental value which would have accrued to the owner had the contractor completed his undertaking on time. In many of the cited decisions the contractor had a general contract which required him to build an entire structure. In some of the others his contract required him to alter or rebuild an exist-

ing building, and in still others his contract imposed upon him the duty of improving a machine or installing upon it a device so that it would have the capacity promised by his undertaking. In all of these instances only the contractor's breach of his undertaking prevented the owner from possessing a building or a machine having the rental value or profit-earning capacity employed in measuring the damages allowed by the court after the default. Instances of the kind to which we have just adverted are *Savage v. Glenn*, 10 Or. 440, and *Williams v. Island City Milling Co.*, 25 Or. 573, 37 P. 49, upon which the plaintiffs expressly rely. In the Savage case the contractor's undertaking was a general one for the construction of the entire building. In the Williams case his contract required him to give to the machinery of a flour mill the capacity mentioned in his undertaking. *Noonan v. Independence Indemnity Co.*, 328 Mo. 706, 41 S. W. (2d) 162, 76 A. L. R. 931, the importance of which the plaintiffs stress, falls into the same category as *Savage v. Glenn*, supra. In other words, the contractor had a general contract for the construction of the entire building.

In *Friedland v. McNeil*, 33 Mich. 40, we find a situation similar to that now before us. The contractor in that case, like the defendants before us, was responsible for the construction of only a part of the work involved in the eventual completion of the entire building. He had undertaken only the masonry work involved in the building of a church. He failed to complete his undertaking within the stipulated time and the church officials, who were the defendants, in a counterclaim sought to hold him responsible for the loss of the pew rents during the period of inexcusable delay. Mr. Jus-

tice Cooley wrote the decision of the court and, in rejecting the counterclaim, said:

"The contract upon which suit was brought was not one the completion of which was to put the building in condition for the renting of pews. A large amount of other work would still remain to be done, and large expenditures to be made, with which this contractor would have no concern whatever; and the building might never be put in condition for the renting of pews and yet he be in no way responsible. It can never be said that the loss of rents is a necessary, natural or probable result of a particular default, when had no default occurred, the necessary conditions to rent would still be wanting, and might never be supplied. Any claim against this contractor for damages resulting from loss of rents must assume that the trustees had the ability and inclination to proceed at once to complete the church, and were only delayed by the contractor's default; but damages so remote and contingent would require to be specially claimed by the pleadings, if recoverable at all, which is doubtful."

Observations of like kind were made in *Winslow Elevator & M. Co. v. Hoffman*, 107 Md. 621, 69 Atl. 394, 17 L. R. A. (N. S.) 1130, and *Bridges v. Lanham*, 14 Neb. 369, 15 N. W. 704, 45 Am. Rep. 121. In the first of these the contractor had undertaken to install an elevator in a six-story building which was in course of construction. In the second he had agreed to build a stone flume. It was the intention of the owner to follow the completion of the flume with the erection of a corn-feed mill. In each instance the court held that the contractor was not responsible for the value of the use of the main structure. In the Winslow case, the court said:

"It is true that in this case the appellant knew at the time it made the contract that the elevator was to be installed in an office building; but it would seem to be

clear, both upon reason and authority, that mere knowledge of that fact would not be sufficient to render it liable for the special losses claimed in this suit. * * * Under such a rule, the plumber * * * who defaulted in his contract to do certain work upon any of the great office buildings might be held liable for enormous special damages simply because he knew his contract had reference to such a building.''

In *Bridges v. Lanhan*, supra (the stone flume case), the court said:

''I have been able to find no case, and certainly we have been cited to none, where it has been held that the price of the use of machinery not in existence in a business yet to be established, can be estimated in any case. Such an estimate must necessarily lack the element of certainty, which we have seen is inflexibly required, both in the nature of the damages and in respect to the cause from which they proceed. When we consider the changeable character of the human mind, as well as of all things in this life, we could say that a corn-feed mill would certainly have been erected on the site in question had the flume been completed by December 1, 1880, or who could testify as to the capacity of such mill, or the value of its use per day or month. For aught that appears, or could properly appear, in this case, the funds for the building of said contemplated mill remained invested in more certain, if not more profitable, security than was offered by the enterprise contemplated. It is obvious, therefore, that the rule of damages laid down in Griffith v. Colver cannot be invoked in favor of the defendants in the case at bar. And the same maybe said of that of Hadley v. Baxendale. Nor do I think that there is any case which furnishes an authority for giving damages as compensation for the loss of the use of the prospective mill, which the plaintiffs contemplated but never built.''

In *Bennett v. Clemence*, 6 Allen (Mass.) 10, the court said:

"The second exception must be sustained. The act complained of by the plaintiff was the cutting down of a part of an unfinished building. The question which was allowed to be put and answered was, what the building would rent for annually when finished according to the plan. If the plaintiff had a right to recover damages, it was for the injury done to his building as it then was; and an opinion as to what it would rent for in a condition of things which did not exist would be sanctioned by no rule of evidence, and would tend to mislead the jury."

■ In the present instance there was no assurance that had the defendants completed their work May 28, the hotel would have been ready for occupancy on July 1. May 28 the plaintiffs did not even possess plans or drawings for the completed structure. Those which they possessed, as Mr. Stubblefield admitted, were the work of "an amateur architect." They do not even indicate the bathrooms or bathroom fixtures. They show no heating fixtures whatever. If the plaintiffs had given any thought to the manner of heating the hotel, no mention was made of it during the trial. They possessed no specifications. Possibly, the absence of specifications may account for the fact that the plaintiffs had not decided, even at the time of the trial, whether the interior finish would be green material or dry lumber. As we have shown, there was no certainty that there was available to the plaintiffs sufficient funds to have enabled them to complete construction of the building. Whether the contemplated McIntyre loan would have enabled them to get the building in readiness for opening as a hotel on July 1 was pure guesswork. Stubblefield did not testify that this loan, had it been made, would have defrayed the expenses of completing the structure. Common experience teaches us that ex-

penses of that kind generally exceed the owner's estimates. The rental value of the completed structure ought not be the measure of damage in the absence of reasonable certainty that the partially built structure will be completed. Otherwise there is thrust upon the defendants all of the hazards of the construction venture which faced these plaintiffs since 1933 when they commenced, accentuated as the hazards were by the fact that the plaintiffs were ''financially embarrassed''—those are the words of their brief. Our conclusion is that the plaintiffs have not shown that the loss of the rental value of their building as a completed structure was the result of the defendants' failure to complete it within a reasonable time.

■■ In instances of this kind we believe that the measure of damage is interest upon the capital invested in the undertaking by the owner at the time of the breach. In other words, the plaintiffs are entitled to receive interest at the going rate upon the amount invested by them in the building and its supporting land. The period to be covered is the period of inexcusable delay. The principle to be employed is that which we quoted in a preceding paragraph from 17 C. J., Damages, p. 854, § 171. The editor of that treatise cites in a footnote decisions which illustrate the application of the principle. Two of them are of the kind employed in the comment which we quoted from the Restatement. The evidence discloses that standing upon the plaintiffs' property is not only the partially completed hotel building but also a small boarding house operated by the plaintiffs and some cabins which they let to those who visit their resort. Accordingly, the plaintiffs are not entitled to interest during the period of delay upon their entire investment in the land, but there should

be some appropriate segregation between the land occupied by the partially completed building and the plaintiffs' other activities. There is no evidence before us showing the cost to date of the future hotel building, nor any evidence disclosing the value of the land. Values should be determined by reasonable outlays and not necessarily by actual expenditures.

■ The above, we believe, disposes of all contentions of the parties, with the exception of the assignment of error which challenges the admissibility of the letter previously described. It will be recalled that it was delivered by the plaintiffs to the defendants after the plumbing inspector had made his first rejection of the work in May. Section 9-226, subd. 3, Oregon Code 1930, says:

"Evidence may be given on the trial, of the following facts * * *. 3. A declaration or act of another, in the presence and within the observation of a party, and his conduct in relation thereto."

It is conceded that this letter was delivered to both Day and Mitchell and that its receipt was followed by the aforementioned conference attended by Day, Mitchell, Stubblefield, the plumbing inspector and the attorney for the plaintiffs and Maloney. The delivery of the letter was the cause of the conference. In the course of the conference the letter was read and received comment. The plaintiffs contend that during the conference both Day and Mitchell admitted the truths of some of the statements in the letter, and that they further expressed a willingness, not only to remedy the defects, but also to make appropriate redress. In fact, they contend that it was at this conference that the defendants agreed to complete their work by May 28, a material detail in the plaintiffs' cause of action. The

defendants quote the following from 10 R. C. L., Evidence, § 352, p. 1149:

"* * * nor will a party be permitted to read in evidence an unanswered letter from himself to the adverse party, for the purpose of proving the truth of facts stated in it."

It will be seen that the present is not an instance of that kind. It is our belief that the aforementioned section of our code rendered the letter admissible.

On account of the aforementioned errors, the judgment of the circuit court will be reversed. The cause will be remanded for appropriate proceedings to be pursued in that court.

RAND, C. J., and BELT and LUSK, JJ., concur.

BEAN, BAILEY and KELLY, JJ., did not participate in this decision.

---

Petition for rehearing denied January 23, 1940

## ON PETITION FOR REHEARING
(98 P. (2d) 14)

ROSSMAN, J. The petition for a rehearing expresses a belief that our decision leaves uncertain the rule we employed in this case, and that confusion will result if upon retrial a state of facts more favorable to the plaintiffs than that presented in the previous trial is developed. Of course, our decision concerned itself with the facts brought before us by the record. However, we cited, employed and quoted from § 331, Restatement of the Law, Contracts, wherein is given the rule for the measurement of damages when a contract is breached. We believe that the rule stated in that section will prove to be practicable in the measurement of damages under any facts developed upon a

retrial. The cases which were cited in our previous decision illustrate in a practical way the application of that rule. The brief accompanying the petition for a rehearing cites as additional authorities: *Long v. Chas. T. Abeles & Co.*, 77 Ark. 150, 91 S. W. 29; *Leifer Mfg. Co. v. Gross*, 93 Ark. 277, 124 S. W. 1039; *Cochran v. People's Railway Co.*, 113 Mo. 359, 21 S. W. 6; *Christopher & Simpson A. I. & F. Co. v. Steininger Const. Co.*, 200 Mo. App. 33, 205 S. W. 278; and *Vaughn v. Conran* (Mo. App.), 20 S. W. (2d) 968. We have read carefully those five decisions but remain satisfied that the rule stated in the Restatement is correct, and do not believe that any of those decisions, with the possible exception of the first, is at variance with that rule. The mere fact that an occasional authority can be found at variance with a given rule constitutes no reason for discarding the latter. As Macaulay said, "A single breaker may recede but the tide is coming in."

After stating, "It is very evident from a reading of the opinion that the court was rather hurried in its decision and did not thoroughly study the testimony," the petitioners express a belief that we overlooked a document known as Plaintiffs' Exhibit 7, being a contract between Mr. Stubblefield and Wickstrom & Womack which required the firm to supply Stubblefield with lumber. If our decision is subject to criticism, we cannot excuse ourselves by saying that we were hurried and failed to "thoroughly study the testimony." We studied the latter with care. Nor did we overlook the exhibit expressly mentioned by the plaintiffs. That contract recited a sale by Stubblefield to Wickstrom & Womack of a small sawmill and a quantity of standing timber at the price mentioned in the contract and then contained the following provision:

"The parties of the second part also promise and agree to cut and properly prepare for the use of the party of the first part 350,000 feet of lumber in the spring of 1938 as early as practicable and to plane 100,000 feet of such lumber or such quantity as the party of the first part may require for use in the hotel building at Lehman Springs, in a good, proper and mechanical manner, said lumber to be paid for at the price arrived at by subtracting the cost of production from the retail price of other sawmills in said vicinity and dividing the difference between the said cost of production and the said retail price of other sawmill plants in the said vicinity and the price thus arrived at shall be the price that the said Fancho Stubblefield shall pay for said lumber. The remainder of said 350,000 feet to be cut and prepared for the party of the first part as he shall require it and it shall be piled in the yard at said sawmill; all flooring for use in said hotel building to be planed, tongued and grooved. Whatever grades of lumber the party of the first part may require for said hotel building at said Springs, he shall have the right to order and the parties of the second part promise and agree to deliver to him at the yard at the regular retail price of lumber to be cut for building material, said price to be credited upon the price of stumpage as ascertained by the scale at said mill yard. All other lumber required by the party of the first part shall be paid for at the customary prices paid at said mill."

It will be observed that this provision of the contract is not free from ambiguities. Moreover, when one applies the above method of calculation by subtracting from the prevailing market price the cost of production and then dividing the two to ascertain the price to be paid by Stubblefield, he is amazed at the result. We stated in our previous opinion that a dispute arose between Stubblefield and Wickstrom & Womack concerning the price to be paid for the lum-

ber. Our calculations made it easy for us to understand why the misunderstanding had developed. No lumber was delivered.

■ The plaintiffs roundly criticize that part of our decision which pointed out that they were not entitled to a measurement of damages based upon the rental value of the building as a fully furnished going hotel. It will be recalled that we stated that there was no evidence indicating that the plaintiffs possessed the money with which to install the furnishings. The brief, after having indulged in this criticism, states: "This, however, we believe to be quite immaterial, and we do not believe that under the circumstances of this case we were under the burden of proving that we had money with which to complete the hotel and furnish the same. It is well settled that money, like the staples of commerce, is, in contemplation of law, always in the market and procurable at the lawful rate of interest * * *. Therefore, in the instant case, without any proof whatsoever that Mr. Stubblefield had made arrangements for the loan of sufficient money with which to complete and furnish the hotel, it would be presumed that the money to do this very thing was available in the open market at the legal rate of interest." Of course, money is procurable, but it is available only to those who possess the necessary credit or collateral. There is no presumption concerning the credit of anyone. Borrowing power is a matter of proof. As stated in our previous decision, the plaintiffs' brief frankly admitted that they were "financially embarrassed." To be financially embarrassed is no disgrace, but it is not a substitute for credit.

■ Notwithstanding the two contentions of which we have just taken notice, we remain satisfied that the record contains no evidence that could justify the measurement of damages on the basis of a going concern.

The petition for a rehearing is denied.

RAND, C. J., and BELT and LUSK, JJ., concur.