Argued May 8, reversed and remanded October 23, 1957

# SMITH *v.* ABEL ET AL

316 P. 2d 793

572

*Ralph Currin,* Pendleton, argued the cause and filed briefs for appellants.

*Ralph Booth McAbee,* Kennewick, Washington, argued the cause for respondent. With him on the brief was Donald R. Duncan, Athena.

Before PERRY, Chief Justice, and BRAND, McALLISTER and KESTER, Justices.

KESTER, J.

This is an action for damages for breach of a contract for the sale of logs. From a verdict and judgment in favor of plaintiff and against defendants Amiel and Milford Abel, said defendants appeal.

The contract out of which the dispute arises was originally a three-party transaction, dated December 3, 1954, whereby (1) "Amiel Abel & Sons" agreed to furnish logs from certain property to a sawmill which they agreed might be erected and operated upon that property; (2) one Buck Sewell agreed to erect and operate the mill and to deliver the lumber to plaintiff, Lowell Smith, at the sawmill site; and (3) Smith agreed to pay specified amounts per thousand board feet to the logger and to the sawmill operator.

Performance under the contract was begun about January 1, 1955; and on or about April 12, 1955, Buck Sewell withdrew from the contract, under a provision giving him permission to do so, and his interest was sold to plaintiff Smith. Thereafter, Smith operated the sawmill until it was shut down on June 9, 1955.

The complaint named as defendants "Amiel Abel, Milford Abel, Beryl Abel, Ardel [sic] Abel, Bud Abel, Richard Roe Abel and John Green Abel, as individuals and as co-partners, doing business under the firm name and style of Amiel Abel and Sons, a co-partnership." Defendants, by their respective answers admitted that Beryl Abel, Emil Abel, Arden Abel and Milford Abel are sons of defendant, Amiel Abel; but they denied that any of the sons had anything to do with the transaction except Milford, who it is claimed was merely an em-

ploye of Amiel. By an affirmative defense, they claimed that the agreement mistakenly referred to "Amiel Abel & Sons," when it should have been in the name of Amiel Abel alone, and they asked that it be reformed to delete "Amiel Abel and Sons," and substitute therefor "Amiel Abel" alone.

The trial court conducted a preliminary hearing on this supposedly equitable defense and concluded that there was a partnership between Amiel and his son Milford (also known as Bud), but that the other sons were not partners and were not bound by the contract. An order was entered that the term "Amiel Abel and Sons" in the contract "be construed to mean Amiel Abel and Milford Abel only," and dismissing the other sons from the case.

The action thereupon proceeded to trial against Amiel and Milford, and a verdict was returned against them for $8,952.55 compensatory damages and $2,000 punitive damages, for which judgment was entered.

■ In our opinion the affirmative defense stated no matter of equitable cognizance, and the question of who were bound by the contract could have been litigated under the general denial as a part of the legal action. However, no appeal has been taken from the order dismissing the other defendants, so that question is not before us.

The complaint, after alleging the contract, the commencement of performance, and the substitution of Smith for Sewell as sawmill operator, alleges:

> "That the said plaintiff herein has at all times since the making and entering into of the said contract done and performed all those things thereunder by the said Plaintiff to be performed, but that the said *Defendants* herein *have* with deliberate malice and intent to injure the said plaintiff and

effectively prevent the said plaintiff from performance of the said contract and with deliberate and malicious intent to force the said Plaintiff out of said contract and take over from the said Plaintiff the operation of the lumber operations of said Plaintiff, *broken the said contract and failed, refused and omitted to perform thereunder all those things and matters by the said defendants to be performed* to the said Plaintiff's damage as follows:

"Loss of profits on 2,883,334 board
feet ............................................................$35,771.91

Actual loss on operations ................... 2,952.55

TOTAL LOSS due to breach of this
contract ...............................................$38,664.46."

(Italics ours.)

■ This is the only allegation of breach. It will be noted from the italicized portion that plaintiff does not allege what constituted the breach. In effect, he pleads merely the conclusion that defendant has broken the contract. Furthermore, the complaint fails to allege when, or over what period, the alleged breach occurred; and it does not show whether the damages are claimed to have occurred to plaintiff's lumber-buying operation, or to his sawmill operation, or otherwise. For these reasons, at least, the complaint would have been vulnerable to motion or demurrer. *Owen et al. v. Leber et al.,* 112 Or 136, 139, 228 P 927; *Oeder v. Watt,* 107 Or 600, 604, 214 P 591; *Barnard & Bunker v. Houser,* 68 Or 240, 244, 137 P 227. However, defendants have not raised the point, either here or in the trial court, and while we could take notice of it under Rule 50 of the rules of this court, we will dispose of the case on other grounds.

None of the briefs contains an adequate statement of the facts. By winnowing through a voluminous record, we glean that the gist of plaintiff's grievance

is that defendants did not deliver logs to the mill in adequate quantities to keep the mill operating steadily; that when logs were delivered, they were not placed on the skids or rollway of the mill but were dumped some distance away, so that the mill operator had to arrange for the logs to be pushed onto the rollway; and that delivery of logs finally ceased altogether.

The evidence is in conflict as to whether, and if so, to what extent, the mill lacked sufficient logs to operate. During the time Sewell was operating the mill he hired a man to skid the logs onto the rollway, apparently as part of the sawmill operation rather than the logging. When Sewell left and Smith took over the mill, the man who had been skidding the logs also left, and Smith made no further arrangements for skidding. Thereafter the men who skidded logs to the landing near the mill, where Abel bucked them into proper lengths, occasionally shoved the bucked logs onto the rollway as a matter of convenience to the mill operator, but apparently without feeling any obligation to do so. Otherwise the mill hands had to skid the logs onto the rollway themselves. This sometimes made it necessary to shut down the mill while more logs were being brought up. Since the mill hands were paid on the basis of lumber produced, these shut downs naturally lowered their income. They did not feel that it was part of their job to put logs on the rollway, so they all quit, at about the same time as delivery of logs was stopped altogether.

The evidence shows that Smith had a separate planer mill, not mentioned in the contract with Abel, and the output of the sawmill was processed by Smith through his planer. Plaintiff claims that as a result of the shut down of the sawmill he was also forced to

shut down the planer, and some of the damages sought are for loss to the planer operation.

Defendants on their part contended (although it is not pleaded as an excuse for stopping delivery) that plaintiff breached the contract by failing to tally the lumber and pay for it at the sawmill. During the time that Sewell operated the mill, he tallied the lumber "at the back of the mill" before delivery to Smith, although payment was apparently made on the basis of the tally made after it had passed through the planer. When Smith took over the mill he discontinued the tally at the sawmill; and he insisted on the right to use the tally at the planer, or in case of a sale of rough lumber, the tally made at the time of sale to the ultimate purchaser. Abel demanded a tally at the sawmill, so that he could check on the tally made at the planer.

The controversy between the parties reached a point where on May 19, 1955, Abel's attorney wrote to Smith, stating: "It is my advice to Mr. Abel that no further deliveries of lumber be made to you until this matter is straightened out and a place of payment more definitely agreed upon by the parties." Log deliveries ceased about June 8 or 9, and the sawmill shut down on June 9, 1955. At the time the mill shut down there was a pile of logs approximately 20 to 30 feet from the rollway, and the immediate cause of the shut down may have been the quitting of the mill hands, rather than the lack of logs; although it is clear that in any event the mill would have had to shut down when the logs then in the vicinity of the mill had been used. On June 14, 1955, Smith's attorney wrote to Abel asserting a breach of the contract (without specifying the manner of breach) and demanding damages.

The contract itself leaves many questions unanswered. It says that the logs will be "furnished to said

sawmill," but it does not say at what point they shall be delivered, or who is to put them on the rollway. Payment is to be made at so much per thousand board feet of lumber, but nothing is said as to where the lumber is to be tallied, or as to where or when payment is to be made. It requires defendants to furnish "all of the merchantable Red Fir, White Fir and Larch timber, estimated to comprise 3,000,000 board feet, upon said premises which same shall be suitable for sawing," but it does not require that logs be delivered at any particular rate, or within any particular time. The contract refers to a "Schedule 'A' annexed hereto and made a part hereof" for a description of the land from which the timber was to come, but apparently the schedule was never attached to the contract. Mention has already been made of the confusion over who were the parties designated by "Amiel Abel and Sons."

Apparently in an attempt to fill some of these gaps, both parties offered evidence of custom. This was a small operation, the timber in question was mostly second-growth, and the mill was of the portable type. Plaintiff put in evidence to the effect that in this kind of operation it is the duty of the logger to place the logs on the rollway, while defendants put in evidence that delivery to the mill yard is sufficient. Defendants put in evidence that it is customary to tally the lumber at the sawmill, while plaintiff put in evidence that it is customary to rely on the tally made at the planer, or at the time of sale to the ultimate purchaser. In this connection, there was evidence that the tally of lumber at the sawmill is less than the log scale made in the woods, and that the tally made after the lumber has been planed is less than the tally at the sawmill. Conflicting evidence was also offered with respect to whether it was economically feasible for plaintiff to

install power equipment for skidding the logs onto the rollway, or to hire an additional man for the purpose of making a tally at the mill.

Plaintiff's monetary claim, aside from punitive damages, is based on the testimony of an accountant who examined Smith's records. According to his computations the loss consisted of:

(1) Loss on operations—$2,952.55. This was determined by subtracting an operating profit in the amount of $280.11 from a loss on abandonment of $3,232.66. The operating profit covered the period December 3, 1954, to June 30, 1955, both before and after Smith took over operation of the sawmill; and it lumped together Smith's planer and sawmill operations. The loss on abandonment was his loss of capital investment in both the planer and sawmill, which he claims resulted from defendants' refusal to deliver logs. Some of the capital investment apparently represented money loaned to or advanced for the account of Sewell on the original construction of the sawmill.

(2) Loss of profits on 2,883,334 board feet of lumber—$35,711.91. This figure was based upon an assumed sale of three million board feet of lumber at $65 per thousand, less the amount actually delivered, from which he subtracted estimated expenses and costs of sale. The contract, in referring to the quantity of standing timber, said "estimated to comprise approximately 3,000,000 board feet," and the difference of 116,666 feet apparently represents the amount actually delivered. There was evidence of a sales price for lumber of approximately $65 per thousand, but no detailed breakdown of the figures for expenses and costs of sale.

Defendants' first group of assignments of error (Nos. 1 to 1-D, inclusive) relate to the admission of evidence offered by plaintiff to prove: (1) details of

operating the sawmill prior to April 12, 1955, when plaintiff took it over; and (2) that certain witnesses would have purchased lumber from plaintiff if the sawmill had continued to operate.

■ With respect to the first of these, it has been pointed out that the complaint did not specify when the alleged breach occurred. At the trial defendants attempted to limit the proof to the period after April 12, 1955, but the pleadings were not so limited. Admissibility must be determined by the issues made by the pleadings, and no error was committed in refusing to restrict plaintiff to events occurring after April 12, 1955. In any event it is difficult to see any prejudice, since most of the same ground was covered by other witnesses.

■ As to the second point, defendants' objection to testimony that the witnesses would have bought lumber from plaintiff was that "it calls for a conclusion" and "is speculative." Since plaintiff was asking for lost profits as damages (of which more later), he was entitled to show a market for his product. The evidence tended to prove only that at the time the mill shut down the witnesses had a present intention of continuing to buy from plaintiff. The existence of that intent was a matter of fact, and the evidence was admissible.

The second assignment of error relates to the admission in evidence of a mass of documentary exhibits purporting to be plaintiff's business records. They were introduced through the testimony of plaintiff's wife, who testified that she kept the records of the sawmill and planer operations, based on information given to her by her husband. The exhibits include various notebooks, invoice books, cancelled checks, bank statements, deposit books, sheaves of correspondence, bills and receipts, installment payment books, copies

of reports to the State Industrial Accident Commission, and other documents which can only be described as "miscellaneous." Plaintiff says, and we can well believe it, that "all the records of this business (planer and sawmill together) were admitted in evidence." It might be added that this volume of material was dumped in the lap of the jury with very little explanation, and much of it was unintelligible.

Defendants objected to the admission of the exhibits as a whole on the grounds that they (1) were hearsay, (2) were self-serving, (3) did not comply with the Business Records as Evidence Act, and (4) included items (such as the planer mill) and covered periods of time (such as before the contract here was executed) that were not in issue. However, defendants did not make specific objections to individual documents.

So far as the Business Records Act is concerned (ORS 41.680 to 41.710 inclusive) the records were admissible, if otherwise relevant. The act vests considerable discretion in the trial court; and the fact that a business is conducted in an informal manner does not exclude such documentary records as it has, if they are properly identified, are contemporary, and if the court is satisfied that "the sources of information, method and time of preparation were such as to justify its admission."[1] This also disposes of the claim that the documents were hearsay and self-serving, as the Business Records Act was intended to obviate those objections.

However, the purpose of that act was not to make evidence relevant which is by its nature irrelevant; and

[1] ORS 41.690: "Admissibility of business records. A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

if the business records contain irrelevant matter, those portions should be eliminated upon proper objection. *Gallagher v. Portland Traction Co.*, 181 Or 385, 392, 182 P2d 354.

■ It is obvious that the records in question contain much irrelevant matter, along with some that is relevant. Ordinarily, in the absence of more specific objections, the trial court would not be required to separate the wheat from the chaff upon his own initiative, nor would we be disposed to do so. *Gallagher v. Portland Traction Co.*, supra. However, in this instance the inclusion of the records of the planer mill, some of which predated the contract in suit, presents a question so fundamental to plaintiff's theory of damages that it cannot be ignored.

Plaintiff claims that his operation of the planer was interwoven with that of the sawmill, and that they cannot be separated. His claim of damages includes anticipated profits from the planer as well as the sawmill, and his claim for capital loss includes his investment in both mills.

■ The evidence shows that plaintiff acquired the planer and commenced operating it (at a separate location) some months before execution of the present contract. During the time before the present sawmill was started he acquired rough lumber from other sources, which was processed through his planer and sold. After this sawmill commenced operating he ceased to buy rough lumber from other sources, but there is nothing to show that rough lumber for his planer was not otherwise available in the open market after the sawmill shut down. Presumably plaintiff could have continued to operate it as he did before this sawmill was constructed. The contract itself does not mention the planer, and there is nothing to show

that damages to the planer operation were reasonably within the contemplation of the parties at the time the present contract was made.

Such damages, if recoverable at all, would be collateral, rather than direct, and under the settled rule in this state must be specially pleaded. *Smith v. Pallay,* 130 Or 282, 290, 279 P 279; *Parker v. Harris Pine Mills,* 206 Or 187, 208, 291 P2d 709.

The complaint makes no mention of damage to the planer operation, or loss as a result of shutting down the planer. Assuming for present purposes, but without deciding, that plaintiff would be entitled to recover loss of anticipated profits from the sawmill, he could not recover under this complaint for loss of anticipated profits from the planer, or loss of capital investment in the planer. While we have construed the complaint liberally in order to find a cause of action, we cannot read into it any allegation that would make admissible evidence of damage with regard to the planer operation. Accordingly it was error to admit the business records relating to the planer.

The confusion of the sawmill and planer operations permeated the entire trial, and the judgment must be reversed. But for the assistance of the circuit court upon another trial, we will comment on some of the remaining assignments of error.

Defendants' third group of assignments of error includes: (1) the admission in evidence of the accountant's statement of plaintiff's profit and loss for the period December 3, 1954, to June 30, 1955, and his statement of plaintiff's anticipated profit if the assumed 3,000,000 feet had been logged, milled, planed and sold; (2) plaintiff's testimony of his estimated profits per thousand board feet on planed lumber; (3) plaintiff's testimony as to the anticipated profits he

lost because of the mill being closed down; (4) the court's denial of defendants' motions for nonsuit and directed verdict, and his alternative motion to limit recovery to nominal damages only.

■ As to the first of these, the profit and loss statement was essentially a summary of plaintiff's business records, which were otherwise in evidence. Therefore it was admissible to the extent that the records themselves were. ORS 41.640(1-e); [2] *Salem Traction Co. v. Anson,* 41 Or 562, 569, 67 P 1015, 69 P 675; *Carrey v. Haun,* 111 Or 586, 597, 227 P 315. But as pointed out above, the records combined both sawmill and planer operations, and the profit and loss statement did likewise. It is impossible to segregate the two in the accountant's report, and it should have been excluded for the reason already mentioned.

■ With respect to the accountant's computation of anticipated profits, it was subject to the same objection of combining sawmill and planer operations, and to the further objection that the facts upon which it was apparently based were not in evidence. That statement was as follows:

"INCOME:

Sales (3,000,000 bd. ft. at $65.00M)..$195,000.00
Less Sales of Delivered Lumber ...... 7,913.21

Total Anticipated Sales
(2,883,334 bd. ft.) ................$187,086.79

---

[2] ORS 41.640(1-e): "There shall be no evidence of the contents of a writing, other than the writing itself, except:

"* * * * *

"When the originals consist of numerous accounts, or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

COST OF SALES:

Lumber ------------------------------------------------$ 65,835.84
Hauling & Skidding ---------------------- 15,640.46
Labor ------------------------------------------------- 49,147.70
Taxes ------------------------------------------------- 3,535.94

 Total Cost of Sales ------------------$134,159.94
 Anticipated Gross Profit on
 Sales -----------------------------------$ 52,926.85

EXPENSES

 Overhead, Office Expenses &
 Depreciation ----------------------------$ 17,214.94

 TOTAL ANTICIPATED IN-
 COME ---------------------------------$ 35,711.91."

There was no attempt to show the source of the figures for expenses and costs of sale, except the general statement that they were based on Smith's records. It is obvious from the figures, however, that more than mere mathematical computation must have been involved. The profit and loss statement for the period December 3, 1954, to June 30, 1955, showed an operating profit of $280.11 for that period, which, when compared to the production of 116,666 feet, gives an operating profit of approximately $2.40 per thousand. Applying this to the assumed 2,883,334 board feet remaining would give a gross operating profit of approximately $6,920, instead of $35,711.91. (Since the mill hands were paid at the rate of so much per thousand feet produced, the expenses of operation would have been roughly proportionate to the production.)

■ Therefore there must have been some variance between the basis for the profit and loss statement and the basis for the anticipated profits statement. To that extent the latter must have rested on hearsay, as the accountant disclaimed any personal knowledge

of the lumber business generally or plaintiff's business in particular. Assuming that anticipated profits are a proper subject for expert testimony, still the facts upon which the opinion is based must appear in evidence. *Henderson v. U.P.R.R. Co.*, 189 Or 145, 167, 219 P2d 170. And the accountant's own testimony, in the absence of personal knowledge, would not be competent to prove the facts upon which his opinion was based. Cf. *Reid v. Yellow Cab Co.*, 131 Or. 27, 32, 279 P 635.

When the accountant's statements were first offered, the trial court admitted the profit and loss statement but excluded that for anticipated profits, on the ground that the latter was too speculative. Subsequently plaintiff himself testified that his estimated profits for lumber actually produced by the mill were about $10 to $12 per thousand on rough lumber and about $15 per thousand on planed lumber. Defendants did not object to the testimony as to profit on rough lumber, but did object to that on planed lumber, and the admission of that evidence is assigned as error. Plaintiff then testified, over objection, that his loss of anticipated profits totalled $34,711.91, and at another point that the total amounted to $38,000 or $39,000, both of which are assigned as error. After the latter testimony, plaintiff renewed the offer of the accountant's statement of anticipated profits; and when plaintiff testified that it represented his own figures, the exhibit was admitted. Defendants' objection was that it was too speculative, as the business was not sufficiently established to have a reliable experience base for the estimation of future profits.

■ For the reasons already mentioned, the testimony as to planer profits, and as to combined profits

including the planer operation, was inadmissible; and the accountant's statement remained so. Furthermore:

> "It is settled law in this state that a witness cannot be permitted to give his opinion of the amount of the damage resulting from an act or omission complained of and that where such opinion has been given in a case the judgment must be reversed unless the verdict is for so small an amount that it is apparent that the error was harmless." *Smith v. Pallay,* 130 Or 282, 288, 279 P 279.

■ As to the motions for nonsuit and directed verdict, it is sufficient to say that there was evidence from which the jury could have found a breach of contract, at least when defendants finally stopped delivery on June 8 or 9, if not before. Such a finding would warrant a verdict for at least nominal damages, and the motions were properly denied.

■ Defendants' alternative motion to limit recovery to nominal damages raises the question whether loss of anticipated profits was recoverable in any event. This court has approved the following statement of the rule in Restatement of the Law, Contracts, § 331, par. 1:

> "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty."

*Stubblefield v. Montgomery Ward,* 163 Or 432, 447, 96 P2d 774, 98 P2d 14, 125 ALR 1228; *Carlson v. Steiner,* 189 Or 255, 264, 220 P2d 100.

That statement is generally qualified as follows:

> "* * * The rule that damages, which are uncertain or contingent, cannot be recovered, does not apply to an uncertainty as to the amount of the benefit or gain to be derived from the performance

of a contract, but to the uncertainty or contingency as to whether there would be any such gain or benefit derived at all."

*Krause v. Bell Potato Chip Co.,* 149 Or 388, 394, 39 P2d 363; *Randles v. Nickum & Kelly,* 169 Or 284, 287, 127 P2d 347.

In *McGinnis v. Studebaker,* 75 Or 519, 523, 146 P 825, 147 P 525, the cases were summarized in this way:

"It will be observed that the rule as stated embraces two elements: (1) The business or benefit of which the complaining party was deprived must have been contemplated by the parties, or reasonably presumed to have been contemplated; and (2) it must be reasonably certain that a gain or benefit was prevented."

*Martin v. Neer,* 126 Or 345, 269 P 342, involved somewhat similar facts. Defendants agreed to sell the timber from a certain tract to plaintiffs, who were the owners of a small sawmill. Shortly after the contract between plaintiffs and defendants, plaintiffs entered into a contract with one Strong, who agreed to buy all the lumber cut from this timber at a certain price. Defendant repudiated the contract to sell the timber, and the question on appeal was as to plaintiffs' measure of damages. This court held that plaintiffs could recover anticipated profits based on the difference between the cost of manufacturing the lumber and the agreed selling price to Strong, since a sale of the lumber must have been in the contemplation of the parties.

In passing, we note that the claim of damages was specially pleaded, which we have previously pointed out was not done in the present case, so far as the planer was concerned. In the Martin case also, both the fact of lost profits and the amount thereof were established with considerable certainty.

The evidence in this case certainly suggests some doubt as to whether the sawmill would have yielded profits at all had delivery of logs continued. The former operator, Buck Sewell, lost money on it between December 3 and April 12, so that he could not continue. Plaintiff himself testified that the reason Sewell sold to him was that "it was not a profitable operation for either him or myself at that time." Yet 58 days later, upon abandonment, the operation is claimed to be worth over $35,000! Plaintiff's operation of the mill from April 12 to June 9, even when combined with his planer operation from December 3 to June 30, yielded an operating profit of only $280.11 (if the accountant's figures from plaintiff's books be taken, rather than plaintiff's oral testimony). And the experience base was hardly that of an established business.

■ Nevertheless, plaintiff testified, without objection, that his profit on rough lumber was "on a thousand feet of lumber, $10 to $12, according to what the price of lumber was at that time." Under all the circumstances, we think that it was for the jury to weigh that testimony against the other evidence. Of course, the evidence may be different upon another trial, but on this evidence it was not error to refuse to limit plaintiff to nominal damages.

■ The fourth assignment of error is based upon a supposedly impeaching question asked of defendants' witness Buck Sewell. On cross-examination Sewell was asked:

"Q Mr. Sewell, have you ever been in any dispute with the United States Government at any time?"

After objection was overruled, he answered:

"A Yes.

"Q How much was involved in that?

"A Well, I think the government got a judgment against me for $800, or something like that.

"Q What did that involve?

"A Well, I was cutting timber up here on that reservation, and the Indian sold me timber he didn't have title to."

The question was obviously improper, under ORS 45.600,[3] but since the case is being remanded, it is unnecessary to decide whether the error was prejudicial.

The fifth assignment of error is directed to the giving of the following instruction on custom:

"If you find from a preponderance of all the evidence herein adduced that it was at the time herein concerned the usual custom in mill operations of the size and nature herein concerned that the provider of the logs shall be paid according to the tally of the lumber made by the customer of the sawmill when delivery of the lumber is made to the customer, you may, in the absence of satisfactory proof to the contrary in this case, take this usual custom into consideration in arriving at your verdict."

The grounds of the exception were:

"(a) That it is against the law of the State of Oregon; (b) That before a custom becomes part of a contract, it must be shown that the knowledge of the custom was had by both parties; (c) That there was no evidence in the record of any knowledge of this custom of the tally of lumber to be

---

[3] ORS 45.600: "A witness may be impeached by the party against whom he was called, by contradictory evidence or by evidence that his general reputation for truth is bad or that his moral character is such as to render him unworthy of belief; but he may not be impeached by evidence of particular wrongful acts, except that it may be shown by his examination or by the record of the judgment, that he has been convicted of a crime."

made at the point where the customer paid for this lumber as sold by Mr. Smith."

The portion of the contract relating to payment was as follows:

"LOWELL W. SMITH agrees to accept delivery of said timber, cut and sawed to his specifications, and delivered on Jacks at the mill site, and to make payment therefor as follows:

"(a) If sawmill is operated by Buck Sewell, To Amiel Abel & Sons—$18.74 per thousand board feet. To Buck Sewell—$18.75 per thousand board feet.

"(b) If the sawmill is operated by LOWELL W. SMITH To AMIEL ABEL & SONS—$18.75 per thousand board feet.

"(c) If the sawmill is operated by Amiel Abel & SONS, To AMIEL ABEL & SONS—$37.50 per thousand board feet; * * *."

 Since the contract was silent as to time and place of payment, but delivery was agreed to be at the millsite, the buyer would ordinarily be obligated to pay on delivery.[4] While custom (if sufficiently shown) might be used to interpret an ambiguous term of the contract, it could not be used to make a contract or to add to or contradict the terms of the contract.[5]

---

[4] ORS 75.420: "Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions; that is to say, the seller must be ready and willing to give possession of the goods to the buyer in exchange for the price and the buyer must be ready and willing to pay the price in exchange for possession of the goods."

[5] ORS 41.900(12): "Evidence may be given of the following facts.

"* * * * *

"Usage, to explain the true character of an act, contract, or instrument, where such true character is not otherwise plain; but usage is never admissible except as a means of interpretation."

■ Before custom can be used for interpretation, it must be shown that it was known to the parties, or was so general that they may be presumed to have known of it and to have contracted with reference to it. *Barnard & Bunker v. Houser,* 68 Or 240, 243, 137 P 227; *Oregon Fisheries v. Elmore,* 69 Or 340, 343, 138 P 862. And ordinarily the custom must be pleaded. *Barnard & Bunker v. Houser,* supra; *Simms v. Sullivan,* 100 Or 487, 491, 198 P 240.

■ In the present case the question of the place of tallying the lumber became significant only because defendants used the lack of a tally at the sawmill as an excuse for stopping delivery of logs. But defendants did not plead any breach on the part of plaintiff, so plaintiff was entitled to rely on the general allegation of performance in the complaint,[6] and there was no occasion for plaintiff to plead the custom to show performance on his part.

■ While the instruction was vague in advising the jury merely that they could take the custom into consideration, without stating for what purpose it might be considered, that was not the point of the objection. There was evidence from which the jury could find a general custom either way, some of which was offered by the defendants. Under the circumstances the instruction was not erroneous.

■■ The sixth assignment grows out of the trial court's refusal to give the following instruction requested by the defendant.

"You are instructed that there is no evidence in this case on malice as set forth in Paragraph VI

[6] ORS 16.480: "In pleading the performance of conditions precedent in a contract, it is not necessary to state the facts showing such performance, but it may be stated generally that the party duly performed all the conditions on his part. If such allegation is controverted, the party pleading is bound to establish on the trial the facts showing such performance."

of Plaintiff's Amended Complaint, and you are, therefore, instructed to disregard the same."

It will be remembered that the complaint demanded punitive damages, and the jury awarded the sum of $2,000 as punitive damages. It is doubtful whether punitive damages are recoverable for breach of contract in any event, *Weaver v. Austin,* 184 Or 586, 600, 200 P2d 593, but that was not the point of the request.

The evidence clearly shows a dispute as to the requirements of the contract, which, in view of the ambiguities in the contract, was understandable. Presumptively the dispute was in good faith, and both parties were represented by counsel at the time of the final parting of the ways. It is axiomatic that punitive damages are not favored in the law, and we find no evidence of the aggravated type of conduct that permits such an award. *O'Harra v. Pundt,* 210 Or 533, 310 P2d 1110.

The judgment is reversed and the case is remanded for further proceedings.