Argued April 1, reversed May 15, 1963

# SHELL OIL COMPANY *v.* BOYER ET UX

381 P. 2d 494

*William D. Campbell,* Portland, argued the cause for appellant. With him on the briefs was Edgar Freed, Portland.

*James R. Ellis,* Portland, argued the cause for respondent. With him on the brief was Howard I. Bobbitt, Portland.

Before McALLISTER, Chief Justice, and SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

GOODWIN, J.

The trial court refused to grant Shell Oil Company specific performance of an option to purchase land held under a service-station lease. Shell appeals.

█ The only question is whether the lessors pleaded and proved such equities in their behalf that the trial court was justified in refusing to enforce the lease. Ordinarily the granting of specific performance is said to be a matter of sound judicial discretion. Such discretion must be exercised in accordance with established principles of equity. *County of Lincoln v. Fischer et al,* 216 Or 421, 438, 339 P2d 1084 (1959); *Temple Enterprises v. Combs,* 164 Or 133, 100 P2d 613, 128 ALR 856 (1940); Restatement, Contracts § 359. Cf. *Patecky v. Friend et al,* 220 Or 612, 624, 350 P2d 170 (1960); *Wagner v. Savage, as Adm'r.,* 195 Or 128, 244 P2d 161 (1952). See Annotation, Specific Performance of a Contract as a Matter of Right, 65 ALR 7 (1930).

The parties have stipulated to many of the facts. The material facts in dispute are those surrounding the execution of the lease. The man who represented Shell in the transaction is dead. Shell therefore put on no evidence about the execution of the lease. The lessors, Forest M. Boyer and Violet Boyer, swore they did not understand that they were giving Shell an option to purchase their property and that they would

not have signed the lease if they had known that it contained such an option.

The Boyers, in their third amended answer, had pleaded fraud. They also pleaded a supposed gross inadequacy of the option price in relation to current market value. As the trial court found nothing inequitable about the option price, and since a major purpose of an option is to protect the optionee against a price increase in any event, we will not pursue that phase of the case further. Cases on this point are collected in the Annotation, 11 ALR2d 390, 406 (1950).

The trial court then said that while fraud, in the usual sense of the word, was not established, specific performance should be denied on the equitable principle that the extraordinary relief of specific performance may be withheld if, in the court's discretion, it is inequitable to grant such relief.

The lease was entered into on November 9, 1950, for a ten-year term beginning in December of 1950. The Boyers had purchased the land for $6,500 in 1949. Mr. Boyer was involved in the buying and selling of real estate and referred to himself as a carpenter-contractor. He built the service station on the land at a cost of $18,000.

The Boyers testified that when they signed the lease they noticed the paragraph entitled "Option to Purchase" and the paragraph entitled "Purchase Refusal". They testified that they asked Shell's agent the meaning of those paragraphs. Then, they recalled, Shell's agent evaded their question as to the purchase option, and read to them from the purchase-refusal provision. The agent said this purchase-refusal option was designed only to give Shell a chance to protect itself should the Boyers ever decide to sell the property. The agent assured them, they said, that Shell

was not interested in buying service stations and so they had nothing to worry about. They further testified that they allowed the agent to fill in the purchase-option price and then initialed the margin to show their assent solely because Shell's agent told them he had to fill in all the blanks on the lease or it wouldn't be legal.

In 1960, Boyer refused to grant Shell a new lease except upon terms that were not acceptable to Shell. Shell thereupon exercised its option under paragraph 18 of the 1950 lease. It is stipulated in the case at bar that Shell has performed every condition precedent to specific performance.

The two options are clear, legible, and understandable. If there is any ambiguity, it has to be found in reading the two options together. The trial court said the options were ambiguous when read together.

The two sections read in their material parts as follows:

"18. *OPTION TO PURCHASE:* In consideration of its execution of this lease, Shell shall have and is hereby granted the exclusive right and option while Shell shall have any tenancy or lease-hold estate or interest of whatsoever nature or kind in the demised premises, whether under this lease and/or any continuation, extension, renewal or holdover thereof, to purchase all real property, buildings, improvements, equipment and machinery demised hereunder for the sum of *Twenty-eight Thousand* Dollars (*$28,000.00*) cash. In the event Shell elects to exercise this option it shall give the Lessor written notice of its said election, designating in such notice an escrow holder for the completion of the purchase, and shall forthwith deposit the purchase price money with such escrow holder * * *. [Italicized amounts are handwritten in ink; initialed "GVB", "V.M.B." and "F.M.B." in margin.]"

"19. *PURCHASE REFUSAL:* In further consideration of its execution of this lease and in addition to Shell's other rights and privileges under this lease, Lessor hereby grants to Shell the first refusal right to purchase the real property * * * upon the same terms, and at the same price of any bona fide offer for the purchase or sale thereof received or made by the Lessor * * * which Lessor or the offeree determines to accept. Lessor shall give Shell written notice of Lessor's receipt or making of any such offer and of Lessor's determination, subject to Shell's rights hereunder to sell the property covered by said offer upon the terms therein set forth * * *."

Since mistake was never pleaded, and since ambiguity between the two options was never directly pleaded, a strict construction of the parol evidence statute, ORS 41.740, would exclude such unpleaded defenses in the case at bar. Shell has not questioned the trial court's assumption that the issues of mistake and ambiguity were before the court, however, so we shall treat the appeal as if the pleadings were broad enough to include those issues.

The lessors, without conceding that the trial court correctly decided the issue of fraud against them, maintain in this court that there was at least a species of overreaching by Shell's agent sufficient to move a court of equity to deny relief. We shall accept, for the purposes of this appeal, the proposition that a sufficient showing of inequitable inducement resulting in an innocent mistake will sometimes justify a court in refusing to hold the parties to their bargain. See, e.g., *Bayne v. Cinak,* 320 Ill 23, 150 NE 344 (1926). The case at bar, however, is not such a case.

■ The only flaw, if any, in the representations attributed to Shell's agent lay in an incomplete and in-

accurate description of the legal effect of the forego-
ing sections of the lease. If the testimony of the lessors
is believed, they relied upon the agent's interpretation
of the legal effect of the two clauses rather than upon
their own reading. Ordinarily, the failure to read an
instrument, when there is ample opportunity to do so,
affords the party no defense to its enforcement. See
*Long v. Smith Hotel Co. et al,* 115 Or 306, 237 P 671
(1925).

■ If the lessors did read the option to purchase, but
chose to disregard its plain language in favor of the
agent's alleged assurance that Shell would never exer-
cise such an option, then in that event, also, their ig-
norance or mistake is not wholly innocent. *Ball v.
Associated Oil Co.,* 151 Or 383, 50 P2d 125 (1935).

■ The lessors' story that the agent prevented them
from reading the option is incredible in view of the
painstaking examination they admittedly made of
other parts of the lease. (For example, they revised
the lease to eliminate Shell's option to terminate in
the event of a loss of volume.) When such testimony
is considered in light of the written lease, which bears
the initials of the lessors opposite the purchase option,
and when the lessors admit that they watched the agent
write into the blank space in the purchase option the
purchase price of $28,000, their denial that they under-
stood the option cannot be taken seriously.

■ In rejecting their testimony, we do not impute to
the lessors any intentional dishonesty. Rather, it is
probable that on trial the lessors recalled in a sub-
jective way long-forgotten conversations. Their nego-
tiations with Shell's agent were concluded ten years
before. The fact that the land had increased substan-
tially in value perhaps taxed the objectivity of the
lessors. The nonavailability of Shell's agent to give

his version of the conversation may have tempted the lessors to interpret the conversation with less than complete detachment. Whatever may be the explanation of their testimony, this case well illustrates the wisdom of the rule that solemn covenants, solemnly arrived at, should be enforced according to their express terms unless there is some good reason for defeating the expressed intention of the parties.

■ The lessors failed to prove that they did not understand the purchase option. Further, even if their testimony were to be taken as true, the fact that they were mistaken about the meaning of the option to purchase, if it were a fact, would not provide a legal basis for refusing to enforce it. Cf. *Bayne v. Cinak,* supra, where the optioner was an immigrant who had difficulty with the English language.

■ This court has adopted the rule that where there are no inequities which appeal to the legal, as contrasted with merely the subjective, discretion of the court, specific performance of a lease is as much a matter of right as damages at law for the breach thereof. *Temple Enterprises v. Combs,* 164 Or supra at 156.

■ Inequity sufficient to enable one to evade his contractual duties must be more than a mere mistake concerning the legal effect of an instrument knowingly executed. It is not sufficient for a person desiring to be relieved of a duty to say, "I did not mean to make such a bargain." While cases involving attempted rescission are not necessarily controlling in cases involving specific performance, we believe the language of this court concerning a service-station lease in a rescission case is equally appropriate here:

"* * * It is admitted that the modification letter or agreement in question was read by plain-

tiffs before they affixed their signatures thereto. Hence plaintiffs had no right to rely upon any representation of the defendant as to the legal effect of the instrument they signed. It spoke for itself in plain and unambiguous language. If the rule were otherwise there would be no certainty or stability in written contracts. Assuming that the alleged representation was made, it concerned a matter of law and not one of fact: *Wicks v. Metcalf,* 83 Or. 687 (163 P. 434, 163 P. 988, L. R. A. 1918A, 493); *McFarland v. Hueners,* 96 Or. 579 (190 P. 584); *Associated Oil Co. v. La Branch,* 139 Or. 410 (10 P. (2d) 597) * * *." *Ball v. Associated Oil Co.,* 151 Or supra at 389.

We believe the better-reasoned decisions allow specific performance of lease agreements in cases substantially similar to the one at bar. See, e.g., *Cunningham et al v. Esso Standard Oil Co.,* 35 Del Ch 371, 118 A2d 611 (1955). When a party seeks to avoid the burdens of an agreement duly made and executed after having enjoyed the benefits thereof, a court of equity will require more than a mere assertion that he did not understand the agreement before the court will permit him to be relieved from it.

■ Since the only option which Shell seeks to exercise is the fixed-price option, it is not necessary to decide whether, in some other case, there might be a latent ambiguity between the two option provisions. The dual-option provisions commonly found in service station leases have been fruitful sources of litigation. Some courts have taken the view, as the trial court apparently did in the case at bar, that the two severally unambiguous options somehow become ambiguous when read together. See, e.g., *Shell Oil Co. v. Blumberg,* 154 F2d 251 (5th Cir 1946). While it might be possible to conceive of a factual setting in which the

two option clauses could not be read together without conflict, we need not explore such possibilities in this case. The lessors have suggested that the very existence of the first-refusal option in the lease made the fixed-price option unworkable. They pleaded and tried their case, however, on a different theory. During the trial, the lessors insisted that they did not know the lease contained a fixed-price option. The lessors have contended that the refusal-option caused them to become confused. We hold that the fixed-price option is an independent covenant that speaks for itself. See *Sinclair Refining Co. v. Allbritton*, 147 Tex 468, 218 SW2d 185, 8 ALR2d 595 (1949). Since the purchase-refusal option was never invoked in this case, we deem it irrelevant that some real or imaginary ambiguity might have been pleaded as a defense if the purchase-refusal option had been exercised or tendered. Cases elsewhere discuss the problems that may arise when an asserted conflict between the two options is relied upon for relief from one of them. See, e.g., *Gulf Oil Co. v. Rybicki*, 102 NH 51, 149 A2d 877 (1959) ; and Annotation, 8 ALR2d 604.

We conclude (1) that the lessors could not have executed the lease as they did without knowing that they were giving Shell a fixed-price option; (2) that one who assents to a plain statement in an instrument should not later be heard to say he did not understand what he was agreeing to, unless there is some evidence, in addition to his own assertion, of facts which would make it inequitable to hold him to his agreement; and (3), that there are no facts in the execution of the lease in this case which shock the conscience of equity. The case must be reversed with instructions to grant specific performance.

Reversed.