Argued and submitted December 18, 1991, on appeal, judgment vacated and remanded for entry of amended judgment; affirmed on cross-appeal June 9, reconsideration denied August 11, petition for review denied September 21, 1993
(317 Or 583)

Dan EULRICH
and Virginia Eulrich,
husband and wife,
*Respondents - Cross-Appellants,*

*and*

DEPARTMENT OF JUSTICE,
*Intervenor - Respondent,*

*v.*

SNAP-ON TOOLS CORPORATION,
a Delaware corporation;
Tim Kash, individually and as a Supervisor of
Snap-On Tools Corporation;
Ray Park, individually and as a Supervisor of
Snap-On Tools Corporation,
*Appellants - Cross-Respondents,*

*and*

Paul HUTCHINS,
individually and as a Supervisor of
Snap-On Tools Corporation,
*Defendant.*

(88-0708; CA A64027)

853 P2d 1350

James H. Clarke, Portland, argued the cause for appellants - cross-respondents. With him on the briefs were Wayne Hilliard, Milo Petranovich, Thomas W. Sondag and Lane Powell Spears Lubersky, Portland.

William D. Brandt, Salem, argued the cause for respondents - cross-appellants. With him on the briefs were Ferder, Ogdahl, Brandt & Casebeer, and Clayton C. Patrick and Arno H. Denecke, Salem.

John T. Bagg, Assistant Attorney General, Salem, argued the cause for intervenor - respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

RIGGS, J.

Edmonds, J., concurring.

Warren, P. J., dissenting.

## RIGGS, J.

Defendants[1] appeal from a judgment entered on a verdict for plaintiff[2] in this case involving a Snap-On Tools dealership and its termination. Plaintiff cross-appeals.

Plaintiff's claims of damages for fraud, breach of good faith and fair dealing and breach of contract arise out of a 1986 dealership agreement under which plaintiff sold Snap-On tools. We state the facts and draw inferences in a manner most favorable to plaintiff.[3]

Defendant Snap-On is a company that manufactures and sells hand tools to a nationwide network of dealers who in turn sell them to professional mechanics. Each dealer is assigned a marketing territory. There was evidence that the marketing system was designed to provide a maximum number of potential dealers and profit for Snap-On while often providing inadequate revenue to support the dealers. As a consequence, dealers quickly fail and are replaced by new recruits who build from the business developed by the failed dealers.

Before he became a Snap-On dealer, plaintiff was an auto body mechanic; he had never operated a business. He initially invested approximately $22,000 in inventory and accounts, which came from his savings. In addition, he promised to pay a balance of $22,500 from sales of inventory. Defendants fraudulently induced plaintiff to enter into the dealership agreement by misrepresenting to him the earning potential of the dealership. Defendants misrepresented the adequacy of the sales territory to support the dealership, and badgered him into making marginal sales and over-extending

---

[1] Defendants are Snap-On Tools Corporation and its supervisors, Kash and Park. A third supervisor is not involved in this appeal. We will refer to the corporation as Snap-On and to the individual defendants by their names. "Defendants" will refer to the corporation and the individuals together.

[2] There are two plaintiffs, Dan and Virginia Eulrich. Their claims are identical. Because all of the material facts relate only to Dan, for ease of reference we will refer throughout this opinion to him as plaintiff. We recognize that Virginia's arguments are the same as Dan's.

[3] Because defendants' first assignment of error arises from the denial of defendants' motion for a directed verdict, we view the facts, including inferences, in the light most favorable to plaintiff, the non-moving party. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *Paulson v. Western Life Insurance Co.*, 292 Or 38, 40 n 1, 636 P2d 935 (1981).

credit to his customers, for which plaintiff was personally liable. From the start, plaintiff's dealership was not profitable. Plaintiff's supervisors, defendants Kash and Park, continually berated plaintiff into believing that his business failure was his own fault rather than the fault of Snap-On's marketing system, and insisted that anyone could succeed as a dealer merely by following Snap-On's sales program. Kash and Park demoralized plaintiff by denigrating his business ability in front of his wife and a large group of dealers.

In early 1987, plaintiff unsuccessfully attempted to get a more profitable territory, because his territory was not supporting him. He was told to work the territory harder. By spring, 1987, plaintiff was financially ruined. He told Kash and Park that he was out of money and that he wanted to exercise his rights under the dealership agreement and terminate his dealership. Beginning in April, 1987, he made numerous attempts to get Kash and Park to "check in" his truck, which he understood would involve taking an inventory of tools and would allow him to receive a refund for the tools and the equity in his van. Because the dealership business had depleted his personal finances, plaintiff needed the money from the tools and the equity in the van to pay his household bills. Kash and Park repeatedly put off the check-in until June 1. By that time, as they knew, plaintiff was in serious financial difficulty and could not pay his living expenses. They also knew that plaintiff's wife was extremely ill with toxemia related to her first pregnancy and required hospitalization. Plaintiff and his wife had no medical insurance and her medical bills made their financial situation even more precarious.

When plaintiff took his van to Portland to check it in, he arrived at 8 or 9 a.m. He and Kash worked for five or six hours to unload and inventory the van. During that time, Kash did not make conversation with him, and his attitude was "not kind at all." After the inventory was completed, plaintiff was told to haul the boxes into the building. By this time, plaintiff was physically tired and emotionally drained. Kash and Park had plaintiff come into Park's office to "do paperwork." They had not explained to plaintiff before then that he would have to sign numerous documents to terminate the dealership. Although they had known for nearly two

months that he wanted to terminate, they had not sent the documents to him in advance to look over before he checked in the van. In the office, Kash and Park continued to berate plaintiff about being a failure, and Park "hollered" at plaintiff about "how sloppy a business practice" he operated and that "a good dealer wouldn't do business the way" plaintiff did. They handed plaintiff "quite a few" documents to sign. Plaintiff testified that Kash and Park would hand him a piece of paper and tell him to sign it and that he did not have a chance to read through all of the papers. He did not take time to read the papers because he was uncomfortable in the hostile environment. Kash told plaintiff that he had to sign the papers before he could get any money. When he asked when he would get a check, Park told him that there would be no checks until the inventory was done and all the papers were signed. By this time, plaintiff just wanted to sign the papers and leave.

Included in the papers that plaintiff signed was a "Termination Agreement." It consists of five numbered paragraphs on one page and includes an agreement by Snap-On to repurchase plaintiff's tool inventory at current dealer cost. The fifth paragraph is a release of claims. Plaintiff did not know at that time that he had legal claims against defendants.

Defendants assert that all of plaintiff's claims are barred by the release, which provides:

> "Except as provided above, each party to this Agreement waives any and all claims it may have against the other arising out of the Dealership terminated by this Agreement and acknowledges that fair consideration has been given. This paragraph is intended to apply and extend to any agents, representatives, officers or employees of either party to this Agreement."

Plaintiff seeks rescission of the release, claiming mistake, undue influence, lack of consideration, adhesion and economic duress. He acknowledges that, if the release is not rescinded, all of his claims for damages are barred. The trial court allowed the rescission, and the jury awarded plaintiff general and punitive damages on all claims in the amount of $8,912,000.

Defendants' first two assignments of error challenge the trial court's denial of their motion for directed verdict on

all claims, based on the release, and its entry of judgment for plaintiff on his rescission claim. We review the rescission claim *de novo. Gardner v. Meiling*, 280 Or 665, 671, 572 P2d 1012 (1977). We conclude that plaintiff is entitled to rescind the release and that, therefore, the trial court did not err in denying defendants' motion for directed verdict.

▇   A party seeking to rescind an agreement must prove the claim for rescission by clear and convincing evidence. *See Erwin and Erwin*, 100 Or App 64, 67, 784 P2d 1109 (1990). Plaintiff asserts that the release should be rescinded because it was executed under economic duress. The gravamen of a claim of economic duress is that, as a result of some wrongful act by one party, the other party is deprived of free will in entering into the agreement. *See Capps v. Georgia-Pacific*, 253 Or 248, 453 P2d 935 (1969). Plaintiff must prove (1) wrongful acts or threats, (2) financial distress caused by those wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented by defendants. *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 68 Or App 131, 142, 683 P2d 95 (1984).

▇   Defendants argue that the pertinent inquiry is whether the conduct that resulted in the signing of the termination agreement, which contained the release, was wrongful. They argue that we should look only at defendants' threat not to repurchase the tools and that, because the dealership agreement did not require defendants to buy back plaintiff's tools, there was nothing legally wrong in that conduct. That inquiry is too narrow.[4]

---

[4] Even if the dissent's narrow approach is taken and we look only at defendants' acts at the time that the termination agreement was executed, requiring plaintiff to sign the termination agreement in order to receive payment for the tools was a wrongful act. The contract conditioned repurchase of the tools on defendants' consent, but defendants' performance of that contract term is subject to the duty of good faith and fair dealing. *Sheets v. Knight*, 308 Or 220, 779 P2d 1000 (1989); *CH2M Hill Northwest, Inc. v. Parktel I, Inc.*, 107 Or App 461, 465, 812 P2d 840 (1991). "A threat is improper if * * * the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient." *Restatement (Second) of Contracts* § 176(1)(d) (1984). A threat may be a breach of the duty of good faith and fair dealing under the contract even if the threatened act is not itself a breach of the contract. *Restatement (Second) of Contracts* § 176, *comment e.* "[I]n the context of duress, an act or threat is wrongful if it is 'an abuse of the powers of the party making the threat; that is, any threat the purpose of which was not to achieve the end for which the right, power, or privilege was given.' " Calamari & Perillo, *Contracts* § 9-3 (3d ed 1987). Defendants had no right to abuse their power to consent under the

■ In determining whether there was economic duress, a court must consider all of the surrounding factors and circumstances. *Capps v. Georgia-Pacific, supra,* 253 Or at 257. Among the factors and circumstances that a court considers are

> " 'the age and mental ability of the party seeking to avoid the transaction, his financial condition, the absence of good faith and reasonable belief by the other party making the demand that he has a good defense or a good cause of action, the adequacy of the consideration passing between the parties, and the adequacy of the legal remedy afforded by the courts.' " *Capps v. Georgia-Pacific, supra,* 253 Or at 256 (quoting *Manno v. Mutual Ben. Health & Accident Assoc.,* 187 NYS 2d 709, 713 (Sup Ct 1959)). (Emphasis deleted.)

Under allegations strikingly similar to the facts of this case, the Supreme Court in *Capps* concluded that the plaintiff had stated a defense of economic duress. 253 Or at 257.

■ Here, there was evidence that defendants' actions, up to the time the termination agreement was signed, were fraudulent and caused plaintiff's economic distress. Defendants knowingly engaged in an ongoing scheme to induce plaintiff into the business, to deny him an adequate sales territory to support his business, to browbeat and demoralize him into believing that the failure of the business was his fault rather than that of the inadequate design of the marketing system, and by depleting all of his financial resources. Defendants knew that their ongoing scheme was causing plaintiff financial distress, resulting in a lack of resources to meet daily household needs and his wife's medical needs. Despite this knowledge, and the provision in the dealer agreement that allowed either party to terminate the agreement on written notification, and despite plaintiff's numerous attempts to return the van and tools for a refund, defendants made plaintiff wait six or seven weeks to terminate the agreement.

Even if the threat not to repurchase the tools unless plaintiff signed the termination agreement was not wrongful in and of itself, defendants engaged in other wrongful acts

---

contract by threatening to withhold consent unless plaintiff executed another contract releasing all claims.

that, taken together with all the circumstances of this case, made the threat wrongful.

> "A threat is improper if the resulting exchange is not on fair terms, and * * * the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat * * *." *Restatement (Second) Contracts* § 176(2)(b).

There is very little question that the exchange was not on fair terms. Defendants had already promised to buy back plaintiff's tools at the price he had originally paid for them. As part of the termination agreement, defendants agreed to repurchase plaintiff's tools at current dealer costs and plaintiff received credit for his inventory in the amount of $38,377. Our review of the record does not reveal any quantification of the difference between that amount and what he would have received if he had been reimbursed at his original cost. Nevertheless, whatever that difference was, it was substantially less than the value of the claims plaintiff released in exchange. Furthermore, the effectiveness of defendants' threat not to repurchase the tools was significantly increased by their prior unfair dealing, which was designed to coerce the release of all claims against them. In the light of all the circumstances leading to the signing of the termination agreement, we conclude that defendants' conduct was wrongful.

■     Nevertheless, defendants argue that there was no economic duress, because plaintiff had reasonable alternatives to signing the release. They contend that, under the dealership agreement, plaintiff had the option of keeping the inventory and selling it outside the dealership, which would have allowed him to recoup his inventory investment, or that he could have refused to sign the agreement, reserving his rights, or could have taken the termination agreement home with him and sought legal advice before he signed it. Under the coercive circumstances present here, those were not reasonable alternatives. The test is whether, given a choice between doing what defendants required or not doing it, was there a reasonable third alternative and, if there was, whether a reasonably prudent person would have taken the alternative course. *Leeper v. Beltrami*, 53 Cal 2d 195, 1 Cal Rptr 12, 347 P2d 12, 19 (1959).

■     Plaintiff had tried in vain for nearly two months to check in his van and tools and obtain the refund that defendants had promised for the tools. During that time, his poor financial situation deteriorated further. Selling Snap-On's product was a losing proposition; it would not have been a reasonable alternative for him to continue that course as a way of recouping his investment. Neither was refusing to sign the termination agreement and seeking a legal remedy a reasonable alternative. By the time defendants finally allowed plaintiff to check in the tools for the promised refund, plaintiff needed money immediately, and defendants knew it. For a legal remedy to be a reasonable alternative, it must be an "immediate and adequate remedy," and whether a remedy is "immediate and adequate" is tested by a practical standard that takes into consideration the exigencies of the situation. *Capps v. Georgia-Pacific, supra*, 253 Or at 255. *See also* Calamari & Perillo, *Contracts* § 9-2 and 9-6; *Restatement (Second) Contracts* § 175, *comment b*. As in *Capps v. Georgia-Pacific, supra*, refusing to sign defendants' termination agreement and commencing legal action against them was not a reasonable alternative, because such a course would have taken time and plaintiff's financial condition was perilous. Faced with the choice between complying with defendants' demand and receiving the badly needed funds, or refusing to sign and facing financial disaster, plaintiff had no reasonable alternative and thus found himself deprived of the exercise of his free will. Accordingly, we conclude that his agreement to the release was a result of economic duress and that the trial court did not err in allowing the rescission.[5]

Defendants' next four assignments of error concern plaintiff's claim for tort damages based on defendants' breach of the covenant of good faith and fair dealing. Defendants assert that the trial court erred in denying their motions for judgment on the pleadings and for a directed verdict on that claim, because there is no tort remedy for breach of the covenant of good faith and fair dealing that is implied in every contract. That argument mischaracterizes plaintiffs' claim. Plaintiff claims that a *special relationship* existed between

---

[5] Because we decide that the release should be rescinded on the ground of economic coercion, we do not reach plaintiff's arguments that the release should be rescinded on the grounds of mistake, undue influence, lack of consideration or adhesion.

the parties and that, from that relationship, a duty of good faith and fair dealing arose that was separate from the contractual duties. Defendants also assert that, even if such a tort exists, the trial court erred in denying their motion for a directed verdict on the claim for lack of evidence of a special relationship and in overruling defendants' objection to submitting the issue to the jury.

■ Defendants rely on *Georgetown Realty v. The Home Ins. Co.*, 102 Or App 611, 796 P2d 651 (1990), for their argument that there is no tort remedy for breach of the duty of good faith and fair dealing. In that case, we held that the plaintiff's claim for damages for the defendant insurer's breach of its fiduciary duty could not be asserted as a tort claim. The Supreme Court reversed our opinion and held that the plaintiff could bring the claim in tort. 313 Or 97, 111, 831 P2d 7 (1992). The court first summarized the general principles applicable to this question:

> "The lesson to be drawn from this court's cases discussing the choice between contract and tort remedies is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both." 313 Or at 106.

It then decided that, like physicians, lawyers, architects and others, liability insurers are subject to a standard of care that exists independent of the contract and without reference to the specific terms of the contract. 313 Or at 110. It explained:

> "When a liability insurer undertakes to 'defend,' it agrees to provide legal representation and to stand in the shoes of the party that has been sued. The insured relinquishes control over the defense of the claim asserted. Its potential monetary

liability is in the hands of the insurer. *That kind of relationship* carries with it a standard of care that exists independent of the contract and without reference to the specific terms of the contract. *See Strickland v. Arnold Thomas Seed,* 277 Or 165, 170, 560 P2d 597 (1977) (marketing agreement gave defendant complete control over pool members' seed; defendant was thus obliged to exercise the fiduciary duties of an agent); *Harper v. Interstate Brewery Co.,* [168 Or 26, 120 P2d 757 (1942)] (mortgagee exercising power of sale creates duty independent of contract). Therefore, plaintiff's excess claim can be brought as a claim for negligence." 313 Or at 110-11. (Emphasis supplied; footnote omitted.)

The question in this case is whether the relationship between defendants and plaintiff was the kind of relationship that carries with it duties that exist independent of the contract and without reference to the specific terms of the contract. If there is such a special relationship, then plaintiff's claim for breach of the duties could be brought as a tort claim.

We find no cases, and the parties cite none, that characterize the relationship between a manufacturer and a dealer as a special or fiduciary-type relationship from which duties independent of the contract arise. Generally, a manufacturer-dealer relationship would not be the kind of relationship discussed by the Supreme Court in *Georgetown Realty.* Unlike physician-patient, lawyer-client, architect-client, insurer-insured and agent-principal relationships, a dealer does not generally place complete control of critical aspects of the dealer's person, property or economic interests in the hands of the manufacturer, and the manufacturer generally does not stand in the shoes of the dealer or otherwise look after the dealer's interests as a fiduciary would.

■■ ■■ This particular manufacturer-dealer relationship is not entirely typical of such relationships, however. If the parties construct an essentially fiduciary-type dependency relationship, duties will arise from that relationship. *See Strickland v. Arnold Thomas Seed,* 277 Or 165, 170, 560 P2d 597 (1977). We cannot say that there was no such relationship between the parties in this case. There was evidence that defendants encouraged plaintiff to enter a relationship of dependence and reliance beyond that contemplated in a typical dealership. There was ongoing, intensive supervision in

which the field manager rode along with plaintiff and actually conducted sales on behalf of plaintiff. Plaintiff's supervisor did all of his paperwork for the first month, and continued to do some of that paperwork throughout plaintiff's tenure as a dealer. Snap-On provided plaintiff with extensive funding and financing and encouraged plaintiff to use Snap-On's credit extending program, even though it was often plaintiff's credit that was being extended.[6] There was also evidence that defendants promised to "take care of" their dealers and exercised complete control over how the business was run and over the size and location of the dealer's territory. When plaintiff first became a dealer for Snap-On, his local supervisors told him which options to get in his Snap-On van, which tools to stock, which advertising items to order and how many of each, and what office equipment and supplies to purchase. There were promotional programs in which Snap-On would deliver to each dealer, whether the dealer wanted it or not, a set amount of the promotional tool of the month and automatically bill the dealer for the cost of those tools. Technically, the dealer could return the shipment, but he would have already been billed for it, and he would have to pay the freight to send the tools back to the Snap-On distribution center. The Dealership Agreement that plaintiff signed gave Snap-On complete control over plaintiff's territory. Snap-On reserved the power to adjust plaintiff's territory at any time. We have cited only a few specific examples in the evidence. Suffice to say that there is evidence from which the jury could find that a special relationship existed between the parties. The trial court did not err in submitting the claim for breach of the obligations of good faith and fair dealing to the jury.

In defendants' seventh assignment, they argue that the trial court erred in denying their motion for a directed verdict, made at the close of plaintiff's case, on plaintiff's claim of fraudulent concealment of material facts.[7] In their second amended complaint, plaintiff alleged:

---

[6] The evidence showed that Snap-On encourages its dealers to extend credit to customers in some cases, allowing the customers to buy tools that they cannot afford at the time of purchase. In theory, the credit is extended by Snap-On, but it is the dealer who is liable to Snap-On for the credited amount.

[7] Plaintiff argues that defendants did not preserve the error for appeal. He argues that the fraudulent concealment allegation was part of his single cause of action for fraud and that defendants' motion for directed verdict was not the proper

"Snap-On markets tools and equipment to professional mechanics through a system of more than 3000 dealers nationwide. The size of dealership territories has been reduced over the past 20 years. *Without 250 to 300 'professional' mechanics in a given territory, a dealer will not be able to achieve a successful independent business. Plaintiffs at all times here mentioned did not know, nor could they have known, how many mechanics were necessary for a successful business.*

"*[Plaintiff] could not have discovered that a minimum of 250 to 300 'professional' mechanics were necessary for a successful business,* because they did not have sufficient information and comparative data of other dealer territories, and their success and failure rates. Such information was only in the hands of the defendants." (Emphasis supplied.)

In their motion for a directed verdict, defendants argued:

"I think we should be clear on what's being alleged as an omission and what is not, and the alleged fact that should have been disclosed was that you need 250 to 300 customers to be a successful dealership, and there's no evidence of that in the record, so there's no basis for a jury finding in favor of the plaintiffs on [that] claim.

"[T]here's no evidence that Snap-On had knowledge of the fact that a dealership must contain 250 to 300 customers to succeed."

The trial court denied defendants' motion for a directed verdict, stating "that there [wa]s evidence in the record from which a jury could find both of the fraud cases, concealment and misrepresentation."

■■ On review of the trial court's denial of defendants' motion for a directed verdict, plaintiff, as the non-moving party, is entitled to the benefit of all favorable evidence and reasonable inferences. We will sustain the denial if there is any evidence in the record from which the jury might conclude that the allegation of fraudulent concealment is true.

---

vehicle for asking the court to decide, as a matter of law, that defendants were entitled to prevail on less than all the elements of the claim. *Whinston v. Kaiser Foundation Hospital,* 309 Or 350, 360, 788 P2d 428 (1990). However, at the time that defendants made their motion for a directed verdict on the fraudulent concealment claim, it was a separate claim and a separate cause of action. Plaintiff's claims for fraudulent concealment and fraudulent misrepresentation were consolidated later in the proceedings. The error was properly preserved.

*Brown v. J. C. Penny Co.*, 297 Or 695, 705 n 3, 688 P2d 811 (1984); *Paulson v. Western Life Insurance Co.*, 292 Or 38, 40 n 1, 636 P2d 935 (1981). In order to withstand a motion for a directed verdict, therefore, the record must contain evidence from which the jury could conclude that a Snap-On dealership had to have 250 to 300 customers in it in order to be successful and that Snap-On knew that information and concealed it from plaintiff.

Jorgeson, a former Snap-On field manager and branch manager, testified that Snap-On had implemented a mandatory growth policy requiring field groups to generate a new territory every year out of existing territories. The result has been continually shrinking territories with fewer than 200 customers. According to Jorgeson, during economic slumps, "dealers cannot survive."

Mikesh, a former Snap-On dealer, testified that his territory "shrank" due to lay-offs and businesses moving out of the area. He testified that, because of that exodus, he was left with fewer than 225 customers and had only four days worth of work every week. Mikesh testified that, before his territory shrunk, he made "something less than $30,000 [a year] before taxes." After customers left his territory, he made less than that and it was his opinion that he could not be successful with the smaller territory.

Plaintiff also presented as an exhibit a document entitled "Success Express: Catch It!" The document is a guide for Snap-On branch and sales managers and contains a check-list called "Dealers Basics for Success." That check-list asks the branch and sales managers to check their dealers to be sure that they have "200 or more R.A. customers" and "at least 50 E.C. Customers."[8] Plaintiff also offered as an exhibit a document entitled "Field Manager New Dealer Checklist." That document contains the same "Basics for Success" check-list. Neither the "Success Express" nor the "Field

---

[8] "R.A." stands for revolving account and "E.C." stands for extended credit. The former accounts are for customers who buy items on a regular basis. The customers (presumably) pay off their accounts on an ongoing basis with charges and credits revolving through. The extended credit accounts seem to be reserved for "big ticket" items, the cost of which the customer pays over time.

Manager New Dealer Checklist'' is distributed or made available to dealers. Both indicate that a dealership must have at least 250 active customers to be successful.

Finally, plaintiff testified that, although he was told that his territory would have 200 to 300 customers in it, he was not told that a territory *required* that many customers in order to be successful.[9] A jury could find from this evidence and the reasonable inferences that can be drawn that. the allegation of fraudulent concealment is true. The trial court did not err in presenting the question to the jury.

In defendants' eighth assignment of error, they argue that the trial court erred in denying their motion for a judgment notwithstanding the verdict and in overruling their objection to the form of the verdict, which granted awards to plaintiff for both fraud and breach of contract.[10] Defendants argue that the awards for fraud and breach of contract are inconsistent and duplicative, because the first is based on rescission and restitution, while the second affirms the contract. According to defendants, plaintiff is not entitled to both awards and should have been required to make an election of remedies.[11] Plaintiff first responds by arguing that defendants did not preserve the issue for appeal, because they did not raise their objection at the proper time. Plaintiff also argues that, even if they did, the awards are not inconsistent or duplicative, because they are based on different conduct by defendants, neither is based on a theory of rescission or restitution and both affirm the contract.

As an initial matter, we find that defendants preserved the issue for appeal. Defendants objected to the form of the verdict as returned by the jury, and were not required to

---

[9] In a separate claim, plaintiff alleged that defendants' representation that his territory would have 200 to 300 customers was false and constituted fraudulent misrepresentation.

[10] Defendants do not assert that the award for breach of the implied covenant of good faith and fair dealing is duplicative. The jury made an independent award on each of the three claims.

[11] Defendants actually argue that plaintiff made an election to affirm the contract after the verdict was returned and, consequently, the award for fraud and the attached punitive damages should be vacated. However, as our discussion indicates, *infra*, we do not find that the award for fraud was based on a theory of rescission and plaintiff's statements affirming the contract after the verdict do not require that the award for fraud be vacated.

demand an election or object before then. ORCP 16C allows a party to plead inconsistent claims, and an election of remedies may be made after the case has gone to judgment on the merits. *Colonial Leasing Co. v. Tracy*, 276 Or 1193, 1196, 557 P2d 639 (1976); *See also Arter v. Spathas*, 98 Or App 362, 779 P2d 1066 (1989). Defendants objected at a proper time, when the jury returned its verdict, and renewed that objection in their motions for judgment notwithstanding the verdict and, in the alternative, for a new trial.

■■■■ On the merits, a party may not affirm and rescind a contract at the same time. However, fraud is not necessarily an action to rescind and, consequently, it is not necessarily inconsistent with a claim for breach of contract. *Godat v. Waldrop*, 78 Or App 374, 379, 717 P2d 180, *rev den* 302 Or 86 (1986). We have said that

> "a party induced by misrepresentation to enter into a contract has an election of remedies; he may rescind the contract and be entitled to return of any consideration he has parted with or he may affirm the contract and sue for damages." *Snyder v. Rhoads*, 47 Or App 545, 554, 615 P2d 1058 (1980). (Citations omitted.)

Thus, a fraud claim is inconsistent with a breach of contract claim only if the plaintiff seeks to rescind the contract as a remedy for the alleged fraud. If the plaintiff seeks to affirm the contract and recover damages, the fraud claim is consistent with a breach of contract claim.

Defendants argue that plaintiff sought restitution and thus sought to rescind the dealership contract. Defendants base that argument on plaintiff's evidence of damages due to defendants' fraud. That evidence showed what plaintiff had invested in the Snap-On dealership, income foregone and other sacrifices made in reliance on defendants' representations.[12] Although that measure of damages sounds in restitution, it does not control the nature of the action or require the conclusion that the award received was restitution.

---

[12] Defendants point to no other evidence in the record indicating that plaintiff sought to rescind the dealership contract through their fraud claim and we find no other such evidence. In the complaint, plaintiff prayed for damages due to defendants' fraud, and do not ask for restitution or rescission of the dealership contract.

■ Damages for breach of contract are awarded with the intent of putting the injured party in as good a position as performance would have. *See, e.g., Stubblefield v. Montgomery Ward & Co.*, 163 Or 432, 448, 96 P2d 774, 98 P2d 14 (1940); 5 Corbin *Contracts* § 992 (1964). The amount of damages required to achieve that purpose can be shown by proof of the value of the anticipated benefit or gain, *e.g.*, future profits, or by proof of the value of expenditures and preparations made, which the injured party reasonably expected to recoup through the anticipated benefit or gain. *See, e.g., Verret v. Leagjeld*, 263 Or 112, 501 P2d 780 (1972); *Western Energy, Inc. v. Georgia-Pacific*, 55 Or App 138, 637 P2d 223 (1981); 5 Corbin *Contracts* § 996 (1964).

■ Plaintiff's evidence of damages due to defendants' fraud showed the amount he invested in the venture in reliance on defendants' fraudulent representations, and the amount he could have earned if he had continued in his previous employment. Those monies represent expenditures plaintiff made and income foregone in preparation for and performance of the dealership contract, which plaintiff reasonably expected to recoup if both parties performed their duties under that contract, and are recoverable as a measure of damages. Plaintiff's recovery for defendants' fraud was in the nature of damages and was not inconsistent with his recovery for defendants' breach of contract.

■ Plaintiff's recoveries for fraud and breach of contract, however, are duplicative in that they compensate plaintiffs twice for the same losses. As was just discussed, plaintiff reasonably expected to recover the expenditures he made and income foregone in preparation and performance of his duties under the dealership contract. The recovery for those sacrifices was to be in the form of profits from the dealership, profits he recovered in the award for defendants' breach of contract. Because the awards for fraud and breach of contract are duplicative, the case must be remanded for plaintiff to make an election of remedies.

■ In defendants' ninth assignment of error, they argue that plaintiff's claim for lost future profits for breach of contract was not supported by the evidence and should not have been submitted to the jury. We review to determine whether there was sufficient evidence to establish that a loss

of profits "probably occurred." *MacLean & Associates v. American Guaranty Life*, 85 Or App 284, 296, 736 P2d 586, *rev den* 304 Or 55 (1987). Loss of profits need not be proved with absolute certainty:

> "[T]o recover for lost profits or sales, a plaintiff must prove these damages with 'reasonable certainty.' * * * Loss of future profits may be established by proof of past profits of an established business * * *." *Willamette Quarries v. Wodtli*, 308 Or 406, 412, 781 P2d 1196 (1989). (Citations omitted.)

As evidence of the existence and amount of his lost profits, plaintiff relied on several documents provided by defendants, including a document that presented income comparisons of Snap-On dealers, tax returns and financial analyses for 18 Portland area Snap-On dealers, and a statement of profit potential for new Snap-On dealers, which stated that

> "your earnings as a Snap-On dealer are above the national income average, enabling you to acquire the good things in life. Successful dealers are among the top 10% of national income brackets, along with doctors, lawyers, and other professionals. * * * [M]ost dealers recover their initial investment in inventory in less than a year."

We find sufficient evidence in the record to support the jury's conclusion that plaintiff proved with reasonable certainty the existence and amount of lost future profits that he would have earned as a Snap-On dealer if defendants performed all their duties under the dealership contract. The trial court did not err in submitting the claim to the jury.

■ In defendants' tenth assignment of error, they argue that the trial court erred in overruling their objection to the verdict when a jury poll established that the same nine jurors did not concur in both awards of punitive damages, for fraud and tortious breach of the duty of good faith. Plaintiff concedes that a unanimous jury found defendants liable on both claims and that different groups of nine jurors voted to award punitive damages on each of the claims. However, plaintiff argues, the law only requires that the same nine jurors decide all elements on a single claim. Plaintiff is correct. In a civil case in which the answers to the questions on a verdict form are interdependent, the same nine jurors must agree on all the answers. The rule does not apply, however, where the

answers to the questions are independent. *Verberes v. Knappton Corporation*, 92 Or App 378, 381, 759 P2d 279, *rev den* 307 Or 78 (1988). Here, the awards of punitive damages were dependent on the jury's conclusion that defendants were liable to plaintiff. All jurors concluded that defendants were liable on *both* claims for which punitive damages were awarded. But the award for punitive damages on the fraud claim was *not* dependent on the award of punitive damages on the claim for tortious breach of the duty of good faith, and the same nine jurors did not have to agree on both awards.

Finally, in defendants' last assignment of error, they claim that the award of punitive damages against them violates the federal Due Process and Excessive Fines Clauses, and Article I, sections 10, 11 and 16, of the Oregon Constitution. We rejected a materially identical argument in *Oberg v. Honda Motor Co.*, 108 Or App 43, 814 P2d 517, *aff'd* 316 Or 263, 851 P2d 1084 (1993).[13] We reject this argument as well. The award of punitive damages was proper.

Plaintiff asks us to consider his assignment of error on cross-appeal only if we remand. Because we affirm the trial court and remand only for an election of remedies, we do not address his assignment.

In light of our disposition, we vacate the judgment. Plaintiff is entitled to an amended judgment awarding compensatory and punitive damages on the claim for breach of the implied covenant of good faith and fair dealing and on the claim they elect between the verdicts on the claims for fraud and breach of contract.

On appeal, judgment vacated and remanded for entry of amended judgment in accordance with this opinion; affirmed on cross-appeal.

**EDMONDS, J.,** concurring.

I agree with the lead opinion that defendants' wrongful conduct toward plaintiff that occurred before the termination agreement was signed, when combined with defendants' conduct on that day, resulted in plaintiff signing the release under economic duress. I do not agree with the assertion that,

---

[13] It is unclear whether the Supreme Court's opinion goes beyond punitive damages in product's liability cases.

if the examination of the evidence is limited to the day that the release was signed, plaintiff made out a case for economic duress. *See* 121 Or App at 31 n 4.

**WARREN, P. J.,** dissenting.

I cannot join in the majority's opinion. In my view, plaintiff has not shown that he is entitled to rescind the release agreement under any of his theories. The release bars all of his claims. Therefore, I would reverse.

The majority concludes that plaintiff may rescind because of economic duress. The gravamen of that claim is the deprivation of a party's free will by the wrongful act of another party. *See Capps v. Georgia-Pacific*, 253 Or 248, 453 P2d 935 (1969). The majority's error is in its global view of what constitutes a "wrongful act." 121 Or App at 31. It considers as pertinent all of defendant's conduct throughout the dealership relationship. However, what is relevant is defendants' conduct *at the time the termination agreement*, which contains the release, *was signed*. It is plaintiff's agreement to that release that is at issue, and it is defendants' conduct as related to that agreement that is pertinent. Thus, the focus must be on whether the conduct that resulted in the signing of the termination agreement was wrongful.

Plaintiff asserts that it was wrongful to require him to sign the termination agreement before he could receive a refund for his tools. However, under the dealership agreement, Snap-On was not required to buy back plaintiff's tools. The agreement provided:

> "In the event of termination of this Agreement * * *, the Dealer may * * * *with the consent of the Company*, * * * sell to the Company at the price paid by the Dealer any of the Products which have been purchased by the Dealer and which remain in its possession in new, saleable condition." (Emphasis supplied.)

Doing what a person has a legal right to do is not wrongful conduct. *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 68 Or App 131, 143, 683 P2d 95 (1984). Because Snap-On had no legally enforceable duty to repurchase the inventory from a terminating dealer, Snap-On and its agents were justified in insisting on a release of all claims plaintiff might have against

them in return for the agreement to repurchase. There was nothing legally wrongful in that conduct.

Further, the majority is wrong in concluding that plaintiff had no reasonable alternatives to signing the termination agreement. The test, as the majority says, is whether, given a choice between doing what defendants required or not doing it, there was a reasonable third alternative; that is, would a reasonably prudent person have taken the alternative course. The termination agreement provided that Snap-On would buy back plaintiff's inventory at current dealer cost. Under the dealer agreement, plaintiff had the option on termination of keeping the inventory and selling it outside the dealership, which would have allowed him to recoup his inventory investment.[1] Plaintiff also could have refused to sign the agreement, reserving his rights, or could have taken the termination agreement home with him and sought legal advice before he signed it. "The whole point of an economic duress claim is that the plaintiff had no reasonable choice but to enter into the contract." *Gruver v. Midas Intern. Corp.*, 925 F2d 280, 283 n 1 (9th Cir 1991). Plaintiff had not one, but at least three, reasonable alternatives to signing the termination agreement. Accordingly, I would conclude that his agreement to the release was not a result of economic duress.[2]

Plaintiff also asserts that the release should be rescinded because of mistake. "In order to avoid a contract on account of a unilateral mistake it is necessary that there be a mistake, that the mistake is basic and known to the other party, or that circumstances are such that the other party, as a reasonable person, should have known of the mistake." *Gardner v. Meiling*, 280 Or 665, 674, 572 P2d 1012 (1977). Plaintiff asserts that he signed the termination agreement not knowing that it contained the release and, therefore, was mistaken as to the existence of the release.

---

[1] Plaintiff argues that, pursuant to a consignment agreement, he was required on termination to return all goods consigned to him, and therefore he did not have the option to keep the tools. That argument is not persuasive, because there is no evidence that plaintiff had any consigned tools in his possession on the date of termination.

[2] In addition, plaintiff testified that, when he signed the termination agreement, he just wanted to get out of the office and get his money back. That is not evidence that his agreement to the release was coerced; indeed, the evidence is that he *wanted* to sign it in order to recoup some of his investment.

The evidence is that, when plaintiff signed the termination agreement, it was one of numerous documents that he was told to sign. He did not read all of the documents, although he was not prevented from doing that. Neither did he ask to take any of the documents home with him to study before he signed them. Although he did not read the termination agreement, Park read it to him. Park did not explain or specifically point out the release provision. Having had the opportunity to read the release and having had it read to him, plaintiff cannot be said to have been mistaken as to the existence of the release provision. It is not enough that plaintiff may not have fully understood the legal effect of the release. *See Shell Oil Co. v. Boyer*, 234 Or 270, 277, 381 P2d 494 (1963).

Plaintiff's attempt to rescind based on undue influence is likewise flawed. Under that theory, plaintiff must show that he was " 'under the domination of [defendants] or by virtue of the relation between them [was] justified in assuming that [defendants would] not act in a manner inconsistent' " with his welfare. *Egr v. Egr et al*, 170 Or 1, 7, 131 P2d 198 (1942) (quoting *Restatement of the Law, Contracts* § 497). The evidence here was that, far from being under defendants' domination, plaintiff was acting contrary to their advice in terminating the dealership. The relationship had by this time become adversary, and there was no evidence that plaintiff believed that defendants were recommending the termination agreement for his, but not their, best interest. There was no undue influence.

Finally, plaintiff asserts that he may rescind because the agreement was one of adhesion, or because it lacked consideration. The release is not avoidable as an adhesion contract. There was consideration given for the release, in the form of the mutual release of claims and defendants' agreement to repurchase the tool inventory. The dealer agreement gave defendant the option to repurchase or not. In exchange for agreeing to repurchase plaintiff's inventory at current dealer cost and to release any claims it may have had against plaintiff, it was entitled to extract the release agreement.

I would hold that the release is enforceable and that it bars all of plaintiff's claims. Accordingly, I dissent.